IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

ESTATE OF DANIEL PESAVENTO,
by Special Administrator Alexandra Pesavento,
and H.P, minor, by her mother and guardian,
Alexandra Pesavento

        Plaintiffs,

-vs-                                                Case No. 24-CV-647

BRYCE RUDEBECK,
and CITY OF APPLETON

        Defendants.

## COMPLAINT

Plaintiffs the Estate of Daniel Pesavento, by Special Administrator Alexandra Pesavento, and H.P., minor, by her mother and guardian, Alexandra Pesavento, by their attorneys, Fox & Fox S.C. and the People's Law Office, for their complaint against defendants Bryce Rudebeck and the City of Appleton, hereby allege as follows:

### FACTUAL ALLEGATIONS

1. Daniel Pesavento—a 33-year-old Native American man, a loving husband, father and friend, and a United States Army veteran—was shot and killed without justification in the driveway of his home by Appleton police officer Bryce Rudebeck on August 12, 2022.

2. Defendant Rudebeck's use of deadly force was unnecessary, unreasonable and excessive.

3. When defendant Rudebeck shot Daniel, Daniel was pointing a gun to his own head because he was despondent and suicidal.

4. At the time he was shot to death, Daniel was experiencing a mental health crisis that was known to defendant Rudebeck.

5. At the time he was killed, Daniel did not pose an imminent threat of death or bodily harm to Rudebeck or anyone else when Rudebeck opened fire on him with his military-grade rifle from 100 feet away and behind a police car.

**Daniel Pesavento**

6. At time of his death, Daniel Pesavento was a 33-year-old Native American man and member of the Seneca and Ho Chunk Tribes.

7. At the time of his death, Daniel worked part time for Woodman's grocery store and was attending school at Fox Valley Technical College to become an automotive mechanic.

8. At the time of his death, Daniel lived in a house at 1500 North Birchwood Avenue in Appleton with his wife, Alexandra Pesavento, and their two-year-old daughter, H.P.

9. Daniel and Alexandra were married in 2014, and H.P. was born June 18, 2020.

10. At the time of his death, Daniel was a highly decorated military veteran.

11. Daniel served as an infantryman in the United States Army from approximately 2007 to 2012.

12. Daniel was honorably discharged from service to his country having attained the rank of Sergeant.

13. Daniel fought in the Iraq and Afghanistan wars, receiving the Afghanistan Campaign Medal with Campaign Star, the Army Commendation Medal, the Army Achievement Medal, the Army Good Conduct Medal, the National Defense Service Medal, the Global War on Terrorism Service Medal, the Iraq Campaign Medal with Campaign Star, the Army Service Ribbon, Overseas Service Ribbon, NATO Medal, Combat Infantryman Badge, and Air Assault Badge.

14. At the time of Daniel's death, it was common knowledge to American law enforcement that post-traumatic stress disorder and its associated suicide risk were critical problems for war veterans, particularly combat veterans.

15. At the time of Daniel's death, official data indicated that over 30,000 veterans had died by suicide between September 2001 and 2019—four times more than the number of those who died in combat in Iraq and Afghanistan, and, in 2020, there were a total of 6,146 veteran suicides, for an average of 16.8 per day.[1]

16. Daniel suffered severe war-induced psychological trauma but, like many veterans, he never sought treatment for his post-traumatic stress disorder due to the social stigma and consequent denial associated with mental illness within military communities.

17. From time-to-time Daniel would use alcohol to cope with the stress he experienced in life.

**The Incident**

18. On the evening of August 12, 2022, Daniel had been drinking.

19. He then got into an argument with Alexandra at their home over family issues.

20. Although she loved Daniel, Alexandra told him that she wanted a divorce.

21. Daniel then became sad, angry and despondent.

22. He retrieved a handgun, and threatened suicide.

23. Over the next several hours, Daniel continued to make suicidal comments, pointing his gun at himself.

24. At some point during their verbal argument, Daniel hit Alexandra in the face with his hand.

---

[1] Carbonad, Guilia (2023, September). The Hidden Suicide Epidemic Among U.S. Veterans. *Newsweek*. https://www.newsweek.com/hidden-suicide-epidemic-us-veterans-1824388

25. At approximately 7:16 P.M., Alexandra texted her mother the message, "Mayday."

26. After receiving this message, Alexandra's mother called 911 and requested that a welfare check be conducted at the Pesavento home.

27. Following his argument with Alexandra, Daniel left with his gun and entered the garage attached to their home, ashamed and despondent over his own actions toward Alexandra.

28. Alexandra, who remained in the bedroom with two-year-old H.P., heard a gunshot from the garage and called 911, fearing Daniel had shot himself.

29. As Alexandra was on the phone with 911, several Appleton Police Department (APD) officers responded to the request for a welfare check at 1500 North Birchwood Avenue.

30. At approximately 7:30 P.M., while she was on the phone with 911, and at the request of police officials, Alexandra left the house with H.P. and walked down the street toward APD police cars that had just arrived.

31. An APD officer then drove Alexandra and H.P. from the area and eventually to the Appleton police station.

32. As Alexandra and H.P. were leaving the area, Daniel opened the garage door to reveal that he was sitting inside the garage in a chair pointing a handgun to the side of his head.

33. Numerous APD officers responded to the call and took positions of cover, including defendant Rudebeck.

34. At no time were any of the responding officers in imminent danger based on their observations of Daniel.

35. All of the APD officers at the scene, including defendant Rudebeck, knew that no one else in or near Daniel's residence were in any danger except the danger Daniel posed to himself.

36. APD officers cordoned off the area from all directions using police tape and traffic barriers so no vehicle traffic or pedestrians could get near the house.

37. Daniel eventually stood up from the chair and walked out of the garage into the driveway in front of his house, pointing the gun to his head and uttering comments about how ashamed he was for having struck his wife.

38. APD officer Sam Gueli, who was positioned south of the Pesavento home, over 150 feet away in a position of cover behind a tree, verbally negotiated with Daniel, attempting to persuade him to drop the gun, as Daniel walked in and out of the garage with the gun pointed to his head.

39. Defendant Rudebeck, APD Officer Anthony Shuman, and APD Officer Anthony Jenkins stood shielded behind the driver's side of an APD squad car that was parked in the roadway of West Brewster Street just east of the Pesavento home, at least 100 feet away from Daniel.

40. Defendant Rudebeck, and Officers Shuman and Jenkins were leaning over the hood of the squad car with their military-grade rifles trained on Daniel while Officer Gueli continued to negotiate with Daniel.

41. As Officer Gueli negotiated with Daniel, several APD officers formed a less-than-lethal team, which was equipped with a ballistic shield, less than lethal shotgun, bean bag rounds, and a taser.

42. The less-than-lethal team communicated over the APD's law enforcement radio that they were located at the northwest side of the Pesavento home.

43. Defendant Rudebeck was aware of the position and communications from the non-lethal team.

44. As Officer Gueli continued to negotiate with Daniel, Daniel walked toward the end of the driveway and paced around the bottom of the driveway, at times pointing the gun to his head or holding the gun at his side where it was pointing at the ground.

5

45. Defendant Rudebeck had a clear, unobstructed view of Daniel while Daniel was walking around the driveway and could see that Daniel was either pointing the gun to his head or at the ground and was never pointing the gun at anyone else or in any other direction.

46. Defendant Rudebeck was aware that Daniel was suicidal and having a mental health crisis.

47. Defendant Rudebeck was aware that the less-than-lethal team was preparing to engage Daniel with less-than-lethal force.

48. Several minutes later, at 8:06 P.M., as Daniel continued to pace around the bottom of the driveway pointing the gun to his head or holding it at his side pointed to the ground, and as the less-than-lethal team was preparing to engage Daniel with less-than-lethal force, defendant Rudebeck opened fire on Daniel with his rifle.

49. Defendant Rudebeck fired four times.

50. All four shots struck Daniel in his body, and he fell to the ground motionless.

51. Because Daniel was turning away from defendant Rudebeck's location with his gun to his own head at the time he was shot, defendant Rudebeck's bullets hit Daniel in the buttocks, right shoulder, and back.

52. No shots entered from the front of Daniel's body.

53. Officer Jenkins did not fire his rifle.

54. Officer Shuman fired one shot from his rifle as Daniel was falling to the ground and missed.

55. After Daniel fell to the ground from the four bullet wounds, defendant Rudebeck and other APD officers allowed Daniel to lie on the ground bleeding to death for an inordinate amount of time.

6

56. Daniel was taken to ThedaCare Hospital where he was pronounced dead from gunshot wounds.

57. At the moment defendant Rudebeck fired the first shot, Daniel was pointing his gun at his own head with the barrel pressed against his temple, he had not taken and was not in the process of taking any kind of threatening stance, and he had not made and was not making any physical or verbal threat toward any of the officers or anyone else.

58. In the nine seconds before defendant Rudebeck opened fire, Daniel never moved his gun from its position of pointing directly at his own head, and he never took any kind of threatening stance or made any physical or verbal threat toward any of the officers or anyone else.

59. During the entire time that Daniel was walking around the driveway before defendant Rudebeck opened fire, he was always pointing the gun either at his own head or at the ground and never in any other direction nor did he take any kind of threating stance or make any physical or verbal threats to the officers or anyone else.

60. Between the time police arrived on scene and the time he was shot, Daniel had not said or done anything to indicate he was contemplating harm to anyone but himself.

61. At no point during the incident did Daniel take any action that would justify the use of deadly force.

62. At no point during the incident did Daniel pose an imminent threat of death or serious bodily harm sufficient to justify the use of deadly force by defendant Rudebeck.

63. Defendant Rudebeck never gave Daniel any warning about his possible use of deadly force before he shot him.

64. Following the shooting, defendant Rudebeck lied to investigators from the Department of Criminal Investigation to cover up his own misconduct, stating that he used deadly force because Daniel took a shooting stance.

65. Following Daniel's death, no police agency present at or knowledgeable of the shooting, informed Alexandra that Daniel had died of gunshot wounds from police fire until many hours after he expired.

66. As a direct and proximate cause of the actions of defendant Rudebeck as detailed above, Daniel suffered, among other things, terror, bodily injury, pain, suffering, and death.

### Count I – 42 U.S.C. § 1983
### Excessive Force

67. Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

68. The actions of defendant Rudebeck in using excessive, unjustifiable, and unnecessary force against plaintiff Daniel Pesavento, violated plaintiff's Fourth and Fourteenth Amendment right to be free from unreasonable seizures and excessive force, and proximately and directly caused his injuries, pain and suffering, mental anguish and humiliation, as set forth above.

### Count II – 42 U.S.C. § 1983
### Loss of Companionship

69. Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

70. The actions of defendant Rudebeck as described above caused plaintiff H.P to lose the companionship of her father Daniel Pesavento for the rest of her life and thereby violated her Fourteenth Amendment right to due process.

71. Due to the misconduct of defendant Rudebeck, plaintiff H.P. suffered the loss of the care, society, companionship, protection, training and guidance of Daniel Pesavento.

### Count III – Indemnification

72. Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

73. Wis. Stat. § 895.46, requires public entities to pay any tort judgment for damages for which employees are liable for acts within the scope of their employment.

74. At all times relevant to this action, defendant Rudebeck committed the acts alleged above in the scope of his employment with defendant City of Appleton. Therefore, defendant City of Appleton is liable as his employer for any resulting damages or award of attorneys' fees.

## JURISDICTION AND VENUE

75. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of plaintiffs' rights as secured by the United States Constitution.

76. This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and state law claims pursuant to 28 U.S.C. § 1367.

77. Venue is proper under 28 U.S.C. § 1391(b). Defendant City of Appleton is a municipal corporation located within this judicial district. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

## PARTIES

78. Plaintiff Alexandra Pesavento is the wife of Daniel Pesavento, she is a resident of Appleton, Wisconsin, and she has been appointed to serve as the Special Administrator of the Estate of Daniel Pesavento. Alexandra Pesavento is a party to this action solely in her capacity as the Personal Representative of her husband's estate.

79. Plaintiff H.P., born June 18, 2020, is the daughter of Daniel Pesavento and resides with her mother and guardian, Alexandra Pesavento. H.P. was two years old at the time of Daniel's death.

80. Defendant Bryce Rudebeck, at all times relevant to this action, was an Appleton Police Department officer employed by the City of Appleton. He is being sued in his individual capacity.

81. At all times relevant to this action, defendant Rudebeck was acting under color of law, was carrying out his duties as an APD officer, and was acting within the scope of his employment with the City of Appleton.

82. Defendant City of Appleton is a Wisconsin municipal corporation and is required to pay any tort judgment for damages for which its employees are liable for acts within the scope of their employment.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs Estate of Daniel Pesavento and H.P., ask that this Court enter judgment in their favor and against defendants Rudebeck and City of Appleton, awarding compensatory damages, attorneys' fees, and costs against them, and, because defendant Rudebeck acted in a malicious and/or willful and wanton manner, punitive damages against defendant Rudebeck as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiffs Estate of Daniel Pesavento and H.P. demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated this 24th day of May, 2024.

Respectfully submitted:

FOX & FOX, S.C.

/s/Michael R. Fox
Michael R. Fox
124 West Broadway
Monona, WI 53716
608/258-9588
mfox@foxquick.com

PEOPLE'S LAW OFFICE

/s/Ben H. Elson
Ben H. Elson
1180 N. Milwaukee Ave.
Chicago, IL 60642
p: (773) 235-0070 ext. 116
ben@peopleslawoffice.com