IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF WISCONSIN

---

ESTATE OF DANIEL PESAVENTO,
by Special Administrator Alexandra Pesavento,
and H.P, minor, by her mother and guardian,
Alexandra Pesavento,

                Plaintiffs,           Judge Byron B. Conway

-vs-                                Case No. 24-CV-647

BRYCE RUDEBECK,
and CITY OF APPLETON,

                Defendants.

---

## DEFENDANTS REPLY TO THEIR
## PROPOSED FINDINGS OF MATERIAL FACT

---

Defendants Bryce Rudebeck and the City of Appleton, by their attorneys, Crivello, Nichols & Hall, S.C., respectfully submit the following Responses to Plaintiffs' response to Defendants' Proposed Findings of Material Fact as follows:

1. Plaintiffs are the Estate of Daniel Pesavento by Special Administrator Alexandra Pesavento and H.P., a minor, by her mother and guardian, Alexandra Pesavento. (Dkt. 18, ¶¶ 88-89).

RESPONSE: Undisputed.

2. Defendants are Appleton Police Officer Bryce Rudebeck and the City of Appleton. (Dkt. 18, ¶¶ 90-92).

RESPONSE: Undisputed.

3. On August 12, 2022, Daniel Pesavento resided with his wife, Alexandra Pesavento, and their two-year-old daughter, H.P., at their home on North Birchwood Avenue in Appleton, Wisconsin. (Pesavento Dep. at 10:4-6; 11:22-24; 12:1-3; 31:23-25; 67:10-14).

1

RESPONSE: Undisputed.

4. When Alexandra arrived home from work with H.P., she observed numerous cans of alcohol laying throughout the residence. (Pesavento Dep. at 49:17-18; 76:3-23).

RESPONSE: Undisputed.

5. Alexandra observed Pesavento to be heavily intoxicated and described him as "beyond drunk." (Pesavento Dep. at 41:17-19).

RESPONSE: Undisputed.

6. Later that afternoon, Alexandra told Pesavento "I can't do this anymore. We need to get a divorce." (Pesavento Dep. at 50:1-2).

RESPONSE: Undisputed.

7. His demeanor immediately escalated and continued to ramp up. (Pesavento Dep. at 50:2-6, 19-22).

RESPONSE: Disputed. This proposed fact mischaracterizes Alexandra's deposition testimony. She testified that when she told Daniel they need to get a divorce, "that upset him even more. He was crying a lot as my daughter was trying to hand him toys, I believe, to try to, you know, make him feel better, cheer him up. But that just upset him more…. So he started packing. But as he's packing, he keeps trying to take the handgun with him. And I kept telling him not to, to put it back, pack your bag, let's go. H.P. starts getting very fussy, because she hasn't had a diaper changed, she hasn't eaten yet, and it's getting on to be like 5, 6:00 at night. So that just started ramping stuff up. Like a lot of – lot of sounds going on. It's very overwhelming. And I started yelling at him. And that's when he snapped and started hitting me." (Pesavento Dep., pp. 50:2-22)

**REPLY: The response does not create any material disputes with respect to these proposed facts.**

8. Pesavento retrieved his handgun. (Pesavento Dep. at 50:12-13; 57:19-24; 59:4-6).

2

RESPONSE: Undisputed.

9. Pesavento then punched Alexandra in the face with closed fists twice. (Pesavento Dep. at 55:8-23).

RESPONSE: Undisputed.

10. Pesavento then threw or knocked Alexandra to the ground and pulled her hair. (Pesavento Dep. at 56:4-7).

RESPONSE: Undisputed.

11. The physical abuse occurred in front of H.P., during which Pesavento was angry and did not appear to be acting like himself. (Pesavento Dep. at 56:8-15).

RESPONSE: Undisputed. Alexandra further testified that she did not believe Daniel would take it any further and did not have a fear for H.P.'s safety and that afterward Daniel came back and "looked at my face and just completely broke. He – I, honestly, don't believe he realized what he was doing when he did it. But when the realization hit, he was in tears. He was screaming. He was so frustrated with himself." (Pesavento Dep. pp. 56:16-24; 57:3- 18)

**REPLY: The response does not create any material disputes with respect to these proposed facts. Additionally, when a responding party disputes a proposed finding of fact, the response must be limited to those facts necessary to raise a dispute. The court will disregard any new facts that are not directly responsive to the proposed fact.**

12. Alexandra repeatedly attempted to calm Pesavento and used H.P.'s bedroom door to block H.P. from Pesavento and keep a safe distance between Pesavento and them. (Pesavento Dep. at 57:7-8; 58:1-11).

RESPONSE: Undisputed.

13. Alexandra texted her mother the word "Mayday." (Pesavento Dep. at 77:18-20).

RESPONSE: Undisputed.

3

14.     Alexandra also texted her mother "He hit me and now he's waving a gun. Police will make it worse." (Pesavento Dep. at 78:24-25; 79:1-4).

RESPONSE: Undisputed.

15.     After receiving that message, Alexandra's mother called 911 and requested a domestic welfare check. (Zieman Dep. at 6:13-20).

RESPONSE: Undisputed.

16.     Following the assault, Alexandra observed Pesavento walk into the garage with the gun. (Pesavento Dep. at 59:4-6).

RESPONSE: Undisputed.

17.     Minutes later, she heard a "pop." Believing Pesavento may have shot himself, Alexandra also called 911. (Pesavento Dep. at 59:8-22).

RESPONSE: Undisputed.

18.     At approximately 7:22 p.m., Appleton Police Department ("APD") officers were dispatched to the residence for a domestic disturbance involving a male and a female reporting an intoxicated male had a gun and was waiving it around. (Rudebeck Dep. at 28:7-13, 25; 29:1; 122:15-23).

RESPONSE: Undisputed.

19.     While en route, one of the original responding officers requested additional units to respond and dispatch updated officers that the male had discharged a firearm. (Rudebeck Dep. at 28:15-19, 25; 29:1; 122:15-16).

RESPONSE: Undisputed.

20.     Based on this information, Officer Rudebeck requested Gold Cross Ambulance and APD Swat Medic also respond. (Rudebeck Dep. at 28:19-21, 25; 29:1).

RESPONSE: Undisputed.

4

21. Officers coordinated with dispatch to safely extract Alexandra and H.P. from the home. (Pesavento Dep. at 60:7-17).

RESPONSE: Undisputed.

22. Upon arrival on scene, Officer Rudebeck removed his SWAT issued rifle from his vehicle, racked a round into the chamber making it "call ready." (Rudebeck Dep. at 30:1-9).

RESPONSE: Undisputed.

23. Officer Rudebeck ran to a marked APD patrol vehicle, belonging to Sergeant Thomas Zieman which was parked approximately 50 to 100 yards east of the residence on West Brewster Street. (Rudebeck Dep. at 30:10-20; 35:2-10; Zellner Declaration ¶ 11: Ex. I).

RESPONSE: Undisputed.

24. Officer Rudebeck observed Alexandra and H.P. being escorted away from the residence by an APD officer and Alexandra was crying. (Rudebeck Dep. at 30:25; 31:1-8).

RESPONSE: Undisputed.

25. Sergeant Zieman requested that Officer Rudebeck stay at Zieman's parked squad near the front end so, Rudebeck positioned himself behind the hood of the squad car, using the engine block as cover. (Rudebeck Dep. at 34:10-25; 35:1).

RESPONSE: Undisputed.

26. Officer Jenkins and Officer Shuman positioned themselves alongside him, also behind the hood of the squad. Officer Rudebeck stood nearest the front bumper, Officer Jenkins in the middle, and Officer Shuman closest to the driver-side mirror. (Rudebeck Dep. at 39:1-13; Jenkins Dep. at 41:21-25; 42:1-4; Zellner Declaration ¶ 11: Ex. I).

RESPONSE: Undisputed.

27. Initially when officers arrived on scene, the garage door was closed and then it opened. (Rudebeck Dep. at 36:1-9; Vander Wielen Dep. 48:25; 49:1-4; Zellner Declaration, ¶ 12: Ex. J, Gueli

5

BWC: 19:35:13).

RESPONSE: Undisputed.

28.     Initially when the garage door opened, Officers Rudebeck, Jenkins and Shuman could not see Pesavento. (Rudebeck Dep. at 51:24-25; 52:1).

RESPONSE: Undisputed.

29.     Officers immediately received radio traffic indicating that some officers had visual confirmation of Pesavento inside the garage with a handgun held to his head. (Rudebeck Dep. at 36:10-16).

RESPONSE: Undisputed.

30.     Officers Rudebeck, Jenkins, and Shuman then observed Pesavento exit the garage holding a handgun to his head, moving it in various directions and then back to his head. (Rudebeck Dep. at 53:1-7, 12-20).

RESPONSE: Disputed. Plaintiffs object to this proposed fact as compound and vague. The phrase "moving it in various directions" is vague and therefore misleading. As Daniel walked in and out of the garage he at times moved the gun from his head to the ground and back to his head, but he did not sweep the gun or point the gun at anyone other than himself. Witnesses testified that Daniel never pointed the gun at the police or in the direction of any residence or person in the neighborhood. In his statement to DCI, Rudebeck never once mentioned that Daniel pointed or swept the gun in his direction. (Petrie Video 00:00– 00:30; Hoerning Video 00:00–00:22; Petrie Dec. ¶ 15; Manuel DCI Statement; Hoerning Dec. ¶ 8-15)[1]

**REPLY: Plaintiffs' response fails to create any genuine dispute of material fact as to these proposed findings. Plaintiffs rely in part on a statement attributed to Calvin Manuel contained in a DCI report, which constitutes inadmissible hearsay and cannot be considered at summary judgment.**

6

Plaintiffs also cite a declaration from Jean Hoerning, but her observations are expressly limited to what she could see from an upstairs window in her home during intermittent periods when Daniel was within her view. (Hoerning Decl. ¶¶ 13–14). Hoerning states only that Daniel pointed the gun in various directions, including toward himself and the ground—testimony that does not contradict Defendants' proposed facts.

Similarly, Robert Petrie's declaration is limited to what he personally observed from his vantage point. (Petrie Decl. ¶ 15). In his deposition, Petrie acknowledged that officers could have been positioned in locations not visible from his home. (Petrie Dep. 17:15–18:1). He further agreed that there were moments when Pesavento moved the firearm from the ground up toward his head, during which the gun would have been pointed in directions other than solely at the ground or his head. (Id. at 19:25–20:4).

The referenced videos likewise depict Pesavento moving the firearm in various directions. (Petrie Video 00:00–00:28).

At summary judgment, a court may consider only evidence that would be admissible or usable at trial. *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000). Before video evidence may be considered, it must be properly authenticated under Federal Rule of Evidence 901. Authentication requires a showing that the recording is what the proponent claims it to be, either through a reliable chain of custody or testimony establishing the accuracy and trustworthiness of the recording. *Smith v. City of Chicago*, 242 F.3d 737, 741–42 (7th Cir. 2001); *United States v. Cejas*, 761 F.3d 717, 723 (7th Cir. 2014).

Here, Plaintiffs attempt to authenticate the so-called Hoerning video through a declaration from the mother of the individual who purportedly recorded it, stating only that her son filmed the video on his cell phone while standing next to her. (Hoerning Decl. ¶¶ 17, 20). That testimony is insufficient to establish either authentication or a proper

7

**foundation for the recording.**

**Additionally, when a responding party disputes a proposed finding of fact, the response must be limited to those facts necessary to raise a dispute. The court will disregard any new facts that are not directly responsive to the proposed fact.**

31. Officers were concerned not only for their own safety but also for the safety of nearby civilians and passing vehicles. (Rudebeck Dep. at 52:14-25; 53:12-20).

RESPONSE: Undisputed.

32. Officers began directing civilians to get inside their homes but not all of them complied. (Rudebeck Dep. at 52:12-17; 53:12-20; 65:1-4; Petrie Dep. at 8:15-19).

RESPONSE: Plaintiffs object to this proposed fact as vague to the extent it does not specify at what time officers began directing civilians to get inside their homes relative to the shooting. While it is undisputed that officers directed civilians to get inside their homes, this occurred well before the shooting and there is no evidence that there were any civilians out in the neighborhood anywhere near the Pesavento home in the minutes leading up to the shooting. One of these civilians, Robert Petrie, testified that he complied with the order to get back in his house, after which he had enough time to record several minutes' worth of video on his cell phone of Daniel in his driveway with a gun to his own head. (Petrie Dep., pp. 8:20- 23, 14:22-15:15)

**REPLY: The response does not create any material disputes with respect to these proposed facts. Plaintiffs cannot create an issue of fact without providing a citation to evidence that directly meets the substance of and rebuts the proposed fact. Additionally, when a responding party disputes a proposed finding of fact, the response must be limited to those facts necessary to raise a dispute. The court will disregard any new facts that are not directly responsive to the proposed fact.**

33. Officers, including Rudebeck, saw traffic and bystanders standing in the area.

8

(Rudebeck Dep. at 64:14-18, 23-25; Shuman Dep. at 57:7-25).

RESPONSE: Plaintiffs object to this proposed fact as vague because it does not specify at what time officers saw traffic and bystanders or where specifically the traffic and bystanders were located and therefore it is misleading. There is no evidence that there were any bystanders anywhere near the Pesavento home near the time of the shooting. (Petrie Dep., 20:6-15) Rudebeck testified that he could not identify where any of the so-called bystanders were located who might be endangered. (Rudebeck Dep., p. 65:5-9)

**REPLY: The response does not create any material disputes with respect to these proposed facts. Plaintiffs cannot create an issue of fact without providing a citation to evidence that directly meets the substance of and rebuts the proposed fact. Plaintiffs attempt to dispute officer testimony that saw traffic and bystanders standing in the area with testimony from Mr. Petrie who was located within his home and testified only that he could not see neighbors or pedestrians out in the area "from where I was." (Petrie Dep., 20:6-15). Plaintiffs also omit contextual testimony from the cited evidence, regarding Mr. Petrie's limited observations. Mr. Petrie testified as follows:**

> **Q. Were there areas you could not see?**
> **A. I told you the areas that I could see. Yes. The areas behind me I could not see.**

**(Petrie Dep., 20:16-18).**

**Plaintiffs further attempt to dispute officer testimony regarding seeing traffic and bystanders in the area with citation to testimony from Rudebeck that he could not recall exactly where the bystanders where standing. (Rudebeck Dep., p. 64:23-65:5-9).**

34. At times, a telephone pole obstructed the officers' view, requiring them to verbally confirm that at least one officer maintained visual contact. (Rudebeck Dep. at 54:2-13).

RESPONSE: Disputed. Plaintiffs object to this proposed fact as vague because it does not specify at what time Rudebeck's view was purportedly obstructed by a telephone pole and is

9

therefore misleading. Rudebeck testified that the telephone pole did not obstruct his vision at the time he discharged his weapon. (Rudebeck Dep. p. 55:2-6)

**REPLY: The response does not create any material disputes with respect to these proposed facts. Plaintiffs cannot create an issue of fact without providing a citation to evidence that directly meets the substance of and rebuts the proposed fact. Undisputed that the telephone pole did not obstruct Rudebeck's vision at the time he discharged his weapon.**

35. Officers attempted to de-escalate, with Officer Jenkins saying words to the effect of, "Hey buddy" and asking Pesavento to drop the gun. (Rudebeck Dep. at 55:23-25; 56:1-6; Jenkins Dep. at 26:10-21; Zellner Declaration, ¶ 12: Ex. J, Gueli BWC: 19:35:13; 20:06:15).

RESPONSE: Disputed. Plaintiffs object to this proposed fact as vague to the extent it does not specify when these statements were made in relation to the shooting, which makes the fact misleading and meaningless. Plaintiffs disagree with Defendants' assertion that saying the words "hey buddy" and "drop the gun" constitute de-escalation. The only officer who attempted to de-escalate the situation was Officer Gueli.

**REPLY: The response does not create any material disputes with respect to these proposed facts. Plaintiffs cannot create an issue of fact without providing a citation to evidence that directly meets the substance of and rebuts the proposed fact. Additionally, when a responding party disputes a proposed finding of fact, the response must be limited to those facts necessary to raise a dispute. The court will disregard any new facts that are not directly responsive to the proposed fact.**

36. Officer Gueli told Pesavento several times he wanted to help him, to think about his daughter and wife, and that they needed him in their life. (Gueli Dep. at 15:3-6; Zellner Declaration, ¶ 12: Ex. J, Gueli BWC: 19:35:13-20:06:15).

RESPONSE: Undisputed.

10

37. Officer Rudebeck could hear Pesavento screaming and yelling phrases such as "kill me" toward Officer Gueli, who had assumed primary communication. (Rudebeck Dep. at 56:21-25; 57:1-11; Zellner Declaration, ¶ 12: Ex. J, Gueli BWC: 19:35:13-20:06:15).

RESPONSE: Undisputed.

38. Officer Rudebeck observed Pesavento to be distraught, which could be an indicator of a mental health crisis but based on his past training and experience Pesavento could also be distraught over the crimes he had committed which included the physical altercation with Alexandria and possibly second-degree endangering safety based on firing a round in his garage. (Rudebeck Dep. at 58:9-25; 59:1-24).

RESPONSE: Disputed. Rudebeck testified that he did believe Daniel was experiencing a mental health crisis when he had the gun pointed to his head, as did Officers Shuman and Jenkins. (Rudebeck Dep., pp. 38:2-23; Shuman Dep., pp. 26:24-27:2; Jenkin Dep., p. 45:13-24) Plaintiffs object to this proposed fact as speculative and without foundation as there is absolutely no evidence that Daniel would have known about possible "crimes"— this is an argument, not a proposed finding of fact.

**REPLY:** **The response does not create any material disputes with respect to these proposed facts. Additionally, when a responding party disputes a proposed finding of fact, the response must be limited to those facts necessary to raise a dispute. The court will disregard any new facts that are not directly responsive to the proposed fact.**

**Further, Plaintiffs object that "there is absolutely no evidence that Daniel would have known about possible 'crimes.'" That assertion is belied by the undisputed record. It is uncontested that Daniel physically assaulted his wife and discharged a firearm inside his garage—conduct of which he necessarily had firsthand knowledge. (*See* Responses to ¶¶ 9, 10, 17, and 19).**

39. Pesavento did not comply with commands to drop the firearm. Instead, he repeatedly moved the handgun from his head and swept it in various directions. (Rudebeck Dep. at 55:23-25; 56:1-6, 11-13; Petrie Dec. ¶ 22, Ex. 2; Zellner Declaration, ¶ 12: Ex. J, Gueli BWC: 19:35:13; 20:06:15).

RESPONSE: Disputed. While it is undisputed that Daniel did not comply with commands to drop the firearm and that he moved the handgun from his head to the ground several times over the course of the 30-minute negotiation, it is disputed that he "swept it in various directions." This characterization is contradicted by the video evidence which shows Daniel at times moving the gun from his head to the ground and back to his head but does not show Daniel sweeping the gun or pointing the gun at anyone other than himself. Moreover, witnesses testified that Daniel never pointed the gun at the police or in the direction of any residence or person in the neighborhood or that Daniel made a sweeping motion with the gun. (Petrie Video 00:00–00:30; Petrie Dec., ¶ 15; Petrie Dep., p. 18:20 – 19:13; Hoerning Video 00:00–00:22; Hoerning Dec. ¶ 8-15)

**REPLY: Plaintiffs' response fails to create any genuine dispute of material fact as to these proposed findings. Plaintiffs again cite the Declaration of Jean Hoerning, but her observations are expressly limited to what she could see from an upstairs window in her home during intermittent periods when Daniel was within her view. (Hoerning Decl. ¶¶ 13–14). Hoerning states only that Daniel pointed the gun in various directions, including toward himself and the ground—testimony that does not contradict Defendants' proposed facts.**

**Similarly, Robert Petrie's declaration is limited to what he personally observed from his vantage point. (Petrie Decl. ¶ 15). In his deposition, Petrie acknowledged that officers could have been positioned in locations not visible from his home. (Petrie Dep. 17:15–18:1). He further agreed that there were moments when Pesavento moved the firearm from the ground up toward his head, during which the gun would have been pointed in directions other than**

solely at the ground or his head. (*Id.* at 19:25–20:4). Plaintiffs also omit contextual testimony from the cited evidence, regarding Mr. Petrie's limited observations regarding civilians. Mr. Petrie testified as follows:

Q. Were there areas you could not see?
A. I told you the areas that I could see. Yes. The areas behind me I could not see.

(Petrie Dep., 20:16-18).

The referenced videos likewise depict Pesavento moving the firearm in various directions. (Petrie Video 00:00–00:28).

At summary judgment, a court may consider only evidence that would be admissible or usable at trial. *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000). Before video evidence may be considered, it must be properly authenticated under Federal Rule of Evidence 901. Authentication requires a showing that the recording is what the proponent claims it to be, either through a reliable chain of custody or testimony establishing the accuracy and trustworthiness of the recording. *Smith v. City of Chicago*, 242 F.3d 737, 741–42 (7th Cir. 2001); *United States v. Cejas*, 761 F.3d 717, 723 (7th Cir. 2014).

Here, Plaintiffs attempt to authenticate the so-called Hoerning video through a declaration from the mother of the individual who purportedly recorded it, stating only that her son filmed the video on his cell phone while standing next to her. (Hoerning Decl. ¶¶ 17, 20). That testimony is insufficient to establish either authentication or a proper foundation for the recording.

Additionally, when a responding party disputes a proposed finding of fact, the response must be limited to those facts necessary to raise a dispute. The court will disregard any new facts that are not directly responsive to the proposed fact.

40. When Pesavento moved the firearm in various directions, the weapon was pointed toward patrol officers and others in the area. (Rudebeck Dep. at 61:6-10; Gueli Dep. at 65:4-16;

13

Zieman Dep. at 26:24-25; 27:1-25; 28:1-2; Petrie Dec. ¶ 22, Ex. 2).

RESPONSE: Disputed. The video evidence shows Daniel at times moving the gun from his head to the ground and back to his head, but it does not show Daniel pointing the gun at anyone other than himself. Witnesses testified that Daniel never pointed the gun at the police or in the direction of any residence or person in the neighborhood. In his statement to DCI, Rudebeck never once mentioned that Daniel pointed the gun in his direction. (Petrie Video 00:00–00:30; Hoerning Video 00:00–00:22; Petrie Dec., ¶ 15; Petrie Dep., pp. 18:20-19:13; Rudebeck Dep., p. 61:11-15; Hoerning Dec. ¶ 8-15)

**REPLY:** **The response does not create any material disputes with respect to these proposed facts. Plaintiffs cannot create an issue of fact without providing a citation to evidence that directly meets the substance of and rebuts the proposed fact. Plaintiffs again cite the Declaration of Jean Hoerning, but her observations are expressly limited to what she could see from an upstairs window in her home during intermittent periods when Daniel was within her view. (Hoerning Decl. ¶¶ 13–14). Hoerning states only that Daniel pointed the gun in various directions, including toward himself and the ground—testimony that does not contradict Defendants' proposed facts.**

**Similarly, Robert Petrie's declaration is limited to what he personally observed from his vantage point. (Petrie Decl. ¶ 15). In his deposition, Petrie acknowledged that officers could have been positioned in locations not visible from his home. (Petrie Dep. 17:15–18:1). He further agreed that there were moments when Pesavento moved the firearm from the ground up toward his head, during which the gun would have been pointed in directions other than solely at the ground or his head. (*Id.* at 19:25–20:4). Plaintiffs also omit contextual testimony from the cited evidence, regarding Mr. Petrie's limited observations regarding civilians. Mr. Petrie testified as follows:**

14

**Q. Were there areas you could not see?**
**A. I told you the areas that I could see. Yes. The areas behind me I could not see.**

**(Petrie Dep., 20:16-18).**

**The referenced videos likewise depict Pesavento moving the firearm in various directions. (Petrie Video 00:00–00:28).**

41. Officers on scene observed Pesavento walking around with the firearm, not putting it down, and not cooperating with law enforcement commands which created a concern he was going to use the firearm on himself or others. (Gueli Dep. at 25:5-14).

RESPONSE: Disputed. Plaintiffs object to this proposed fact as vague and compound. It does not specify which specific officers observed these things and developed this concern. The cited testimony only pertains to Officer Gueli. While it is undisputed that Daniel was walking around his driveway with a firearm pointed against his head or at the ground, that he was not putting it down in response to law enforcement commands, and that this obviously created a concern that he was going to use the firearm on himself, it is disputed that these actions created a concern that Daniel was going to use the firearm on others. Daniel never indicated verbally or otherwise that he intended to use the firearm on anyone other than himself. (Gueli Dep., pp. 25:15-26:3; Hoerning Dec. ¶ 8-15) Furthermore, Officer Gueli, who was the only officer designated to negotiate with crisis and was in constant contact with Daniel, directed all of his statements toward talking Daniel out of killing himself—that his wife and child needed him—and when Daniel was shot, Gueli thought Daniel had shot himself. (Gueli Dep., p. 38:9-18; Gueli BWC 19:35:44-20:06:15)

**REPLY: The response does not create any material disputes with respect to these proposed facts. Plaintiffs cannot create an issue of fact without providing a citation to evidence that directly meets the substance of and rebuts the proposed fact. Additionally, when a responding party disputes a proposed finding of fact, the response must be limited to those facts necessary to raise a dispute. The court will disregard any new facts that are not directly**

15

**responsive to the proposed fact.**

42. Officers understood that being on the opposing side of a firearm presents an inherent threat and reasonably feared for their safety in such circumstances. (Gueli Dep. at 24:12-16).

RESPONSE: Disputed. Plaintiffs object to this proposed fact as vague and misleading in terms of what "officers understood" and "being on the opposing side of a firearm." Gueli made this statement in response to questions about his training and accuracy with a handgun at different distances. Since Gueli is not an expert witness he is not permitted to give an opinion about what any officer other than himself understood in this context. (Gueli Dep., pp. 20:21 - 24:16)

**REPLY: The response does not create any material disputes with respect to these proposed facts. Plaintiffs cannot create an issue of fact without providing a citation to evidence that directly meets the substance of and rebuts the proposed fact. Additionally, when a responding party disputes a proposed finding of fact, the response must be limited to those facts necessary to raise a dispute. The court will disregard any new facts that are not directly responsive to the proposed fact.**

43. Officer safety was central to the response to Pesavento because he was an armed and noncompliant subject. (Gueli Dep. at 106:5-15).

RESPONSE: Disputed. Plaintiffs object to this proposed fact as vague to the extent that phrase "central to the response" has no specific meaning and is therefore misleading. The officers' response multipurpose—preventing injury to Daniel's family, neighbors, and preventing Daniel from killing himself.

**REPLY: The response does not create any material disputes with respect to these proposed facts. Plaintiffs cannot create an issue of fact without providing a citation to evidence that directly meets the substance of and rebuts the proposed fact. Additionally, when a responding party disputes a proposed finding of fact, the response must be limited to those**

16

**facts necessary to raise a dispute. The court will disregard any new facts that are not directly responsive to the proposed fact.**

44. Pesavento began walking down the driveway toward the street and officers positioned on West Brewster Street. (Rudebeck Dep. at 61:24-25).

RESPONSE: Disputed. Plaintiffs object to this proposed fact as vague and compound and therefore misleading. While it is undisputed that at a certain point over the course of the 30-minute negotiation Daniel made his way to the end of the driveway, it is disputed that he walked toward the officers positioned on West Brewster Street. The cited portion of Rudebeck's deposition does not support this assertion. When Daniel stepped off the driveway and onto West Brewster Street, he was walking in a semi-circle back toward the driveway with the gun pointing against his head and looking down at the ground. (Petrie Video 00:26–00:30; Hoerning Video 00:13–00:22)

**REPLY: The response does not create any material disputes with respect to these proposed facts. Plaintiffs cannot create an issue of fact without providing a citation to evidence that directly meets the substance of and rebuts the proposed fact. Additionally, when a responding party disputes a proposed finding of fact, the response must be limited to those facts necessary to raise a dispute. The court will disregard any new facts that are not directly responsive to the proposed fact.**

45. At one point, Pesavento took several aggressive steps toward Officer Jenkins, looked at his position, and yelled, "Just kill me!" (Jenkins Dep. at 46:13-25; 47:1-4).

RESPONSE: Disputed. Plaintiffs object to this proposed fact as vague because it does not specify when during the 30-minute negotiation Daniel "took several aggressive steps." Although Jenkins made this statement to DCI and reaffirmed it in his deposition, none of the video evidence shows Daniel taking "several aggressive steps toward Officer Jenkins." (Petrie Video 00:00–00:30; Hoerning Video 00:00–00:22) Witnesses testified that Daniel never did anything that threatened the

17

police. (Petrie Dec., ¶ 16-17) Moreover, Jenkins further testified that the "aggressive steps" occurred substantially before he attempted to fire his weapon. (Jenkins Dep., p. 46:25 – 47:4) Furthermore, Jenkins made this assertion to justify the shooting before he knew of or saw the citizen videos that contradict his statement. (Jenkins Dep., pp. 8:12-15, 14:9-12)

**REPLY: Plaintiffs' response does not create any genuine dispute of material fact as to these proposed findings. A party cannot manufacture a factual dispute without citing evidence that directly addresses—and rebuts—the substance of the proposed fact.**

**Plaintiffs rely on two short video clips (Petrie Video 00:00–00:30; Hoerning Video 00:00–00:22) that together capture approximately 52 seconds of an encounter that lasted roughly 31 minutes. (Zellner Decl. ¶ 12; Ex. J, Gueli BWC at 19:35:13–20:06:15). The absence of particular conduct within those brief excerpts does not create a factual dispute as to whether that conduct occurred at some point during the encounter.**

**Nor does Plaintiffs' reliance on Petrie's declaration establish a genuine dispute. Petrie concedes that he could not hear what Daniel was saying because his windows were closed and qualifies his observations by stating only that "while I observed him, I never saw Daniel do anything that I felt threatened the police." (Petrie Decl. ¶¶ 11, 17). Petrie did not observe the encounter from its outset—indeed, he states that when he first looked outside, Pesavento was already outside the garage. (*Id.* ¶ 9). In any event, Petrie's subjective assessment of whether Daniel's conduct appeared threatening does not directly rebut the proposed fact that Pesavento took several aggressive steps toward Officer Jenkins.**

**Additionally, when a responding party disputes a proposed finding of fact, the response must be limited to those facts necessary to raise a dispute. The court will disregard any new facts that are not directly responsive to the proposed fact.**

46.     Officer Rudebeck was aware that a less-lethal team was attempting to position north

18

of the residence and that a sniper was positioned to the south. (Rudebeck Dep. at 45:9-25; 46:1-3; 47:21-25; 49:12-23).

RESPONSE: Undisputed.

47. Officer Rudebeck understood that the sniper's role was not to act as a lethal overwatch, but instead to use specialized equipment—such as magnification optics—to observe areas not visible to the naked eye and relay information to patrol officers. (Rudebeck Dep. at 50:11-20).

RESPONSE: Disputed. Officer Herbert testified that his role as the sniper was to "be able to deploy lethal threat or lethal force." (Herbert Dep., p. 10:11-18)

**REPLY: The response does not create any material disputes with respect to these proposed facts. Plaintiffs cannot create an issue of fact without providing a citation to evidence that directly meets the substance of and rebuts the proposed fact. Plaintiff attempts to dispute what "Officer Rudebeck understood that the sniper's role was" based on his training with citation to testimony from Officer Herbert regarding is understanding of the sniper function in accordance with Appleton Police Department policy part of what he understood his role to include. (*Id.*) Plaintiffs also omit contextual testimony from the cited evidence, regarding Officer Herbert's multiple functions. Officer Herbert testified as follows:**

> **A. First priority is to gain information and intelligence to be able to determine what's going on, be able to gather information that other people without my skill set or equipment aren't able necessarily to get, and then also be able to deploy lethal threat or lethal force.**

**(Herbert Dep., p. 10:13-18). Regardless, the response does not create any material disputes with respect to these proposed facts.**

48. Officer Rudebeck heard via radio that the less-lethal team attempted several times to approach Pesavento but were unable due to him moving back and forth down the driveway and looking in the direction of the team. (Rudebeck Dep. at 80:2-18).

RESPONSE: Disputed. Plaintiffs object to this proposed fact as vague because it does not

19

indicate the specific time that Rudebeck heard these things via radio which makes it misleading. To the extent the less lethal team was initially unable to approach Daniel, this occurred, according to Rudebeck, somewhere between 30 minutes to 1 hour before Rudebeck opened fire. (Rudebeck Dep., pp. 80:2 – 81:11) Between 7:59 p.m. and 8:05 p.m., the less lethal team moved from a position of several hundred feet east of the Pesavento home to the northwest side of the Pesavento home. (VanderWielen BWC 19:59:50–20:05:38) Rudebeck was aware that there was a plan for the less-lethal team to attempt to take Daniel into custody using less-lethal force, and he was aware of the positioning of the less-lethal team. (Rudebeck Dep., pp. 45:9–25, 46:1–3, 47:21–25, 48:1; Rudebeck BWC 19:58:42–20:06:00; Herbert Dep., pp.

41:12–25, 42:1–10) When Daniel was at the bottom of the driveway, Rudebeck was aware that the less lethal team was positioned next to the Pesavento home and ready to engage Daniel with less lethal force. (Rudebeck Dep., pp. 36:10–25, 37:1, 38:19–23, 44:21–25, 45:1–20, 55:11–

22, 58:8–14, 66:7–12; Rudebeck BWC 20:05:58—20:06:17; VanderWielen BWC 20:05:58– 20:06:17)

**REPLY: The response does not create any material disputes with respect to these proposed facts. Plaintiffs cannot create an issue of fact without providing a citation to evidence that directly meets the substance of and rebuts the proposed fact. Additionally, when a responding party disputes a proposed finding of fact, the response must be limited to those facts necessary to raise a dispute. The court will disregard any new facts that are not directly responsive to the proposed fact.**

49.     There was also a crossfire concern with deploying the less-lethal team based on the position of Officer Rudebeck, Jenkins, and Shuman. (Vander Wielen Dep. at 14:8-25;15:1-19).

RESPONSE: Disputed. Plaintiffs object to this proposed fact as vague because it does not indicate the specific time that this purported crossfire concern occurred which makes it misleading. At the moment Rudebeck opened fire, there was no concern about a potential crossfire issue.

20

Rudebeck testified not that there actually was a crossfire issue but that depending on which way Daniel moved, he *might* create a crossfire issue and Officer Thor testified that there are a "million ways" to avoid such an issue. (Jenkins Dep., pp. 40:11– 13, 48:3–10; Rudebeck Dep., pp. 63:8–19, 66:23–25, 67:1–6, 99:23–25, 100:1; Thor Dep., pp. 21:9 – 23:16)

**REPLY: Plaintiffs' response fails to create any genuine dispute of material fact as to these proposed findings. A party cannot manufacture a factual dispute without citing evidence that directly addresses—and rebuts—the substance of the proposed fact.**

**Plaintiffs attempt to dispute Lieutenant VanderWielen's testimony regarding a *crossfire concern associated with deploying the less-lethal team* by citing Officer Rudebeck's testimony that Pesavento "never got in the crossfire" because officers would not allow him to do so. (Rudebeck Dep. 99:23–25, 100:1). These statements are not in conflict. VanderWielen testified about the risk and concern that officers could be placed in a crossfire if the less-lethal team advanced, whereas Rudebeck's testimony addressed whether Pesavento was ever actually permitted to enter a crossfire zone. Moreover, the record reflects that Pesavento had no knowledge of where the less-lethal team was positioned once it moved away from Zieman's squad. (Rudebeck Dep. 45:21–46:3). That lack of awareness further supports the existence of a legitimate crossfire concern and does not rebut VanderWielen's testimony.**

**Additionally, when a responding party disputes a proposed finding of fact, the response must be limited to those facts necessary to raise a dispute. The court will disregard any new facts that are not directly responsive to the proposed fact.**

50. The crossfire concern was that should the less-lethal team move they could be the direct backdrop for shots fired by Officer Rudebeck, Jenkins, and Shuman depending on where Pesavento moved to. (Vander Wielen Dep. at 14:13-25; 15:1-6; 16:15-21).

RESPONSE: Disputed. Plaintiffs object to this proposed fact as vague because it does not

21

indicate the specific time that this purported crossfire concern occurred which makes it misleading. At the moment Rudebeck opened fire, there was no concern about a potential crossfire issue. Rudebeck testified not that there actually was a crossfire issue but that depending on which way Daniel moved, he *might* create a crossfire issue and Officer Thor testified that there are a "million ways" to avoid such an issue. (Jenkins Dep., pp. 40:11– 13, 48:3–10; Rudebeck Dep., pp. 63:8–19, 66:23–25, 67:1–6, 99:23–25, 100:1; Thor Dep., p. 21:9 – 23:16)

**REPLY: Plaintiffs' response fails to create any genuine dispute of material fact as to these proposed findings. A party cannot manufacture a factual dispute without citing evidence that directly addresses—and rebuts—the substance of the proposed fact.**

**Plaintiffs attempt to dispute Lieutenant VanderWielen's testimony regarding a *crossfire concern associated with deploying the less-lethal team* by citing Officer Rudebeck's testimony that Pesavento "never got in the crossfire" because officers would not allow him to do so. (Rudebeck Dep. 99:23–25, 100:1). These statements are not in conflict. VanderWielen testified about the risk and concern that officers could be placed in a crossfire if the less-lethal team advanced, whereas Rudebeck's testimony addressed whether Pesavento was ever actually permitted to enter a crossfire zone. Moreover, the record reflects that Pesavento had no knowledge of where the less-lethal team was positioned once it moved away from Zieman's squad. (Rudebeck Dep. 45:21–46:3). That lack of awareness further supports the existence of a legitimate crossfire concern and does not rebut VanderWielen's testimony.**

**Additionally, when a responding party disputes a proposed finding of fact, the response must be limited to those facts necessary to raise a dispute. The court will disregard any new facts that are not directly responsive to the proposed fact.**

51.     Officer Rudebeck was aware via radio communication that Pesavento was explicitly referencing "suicide by cop" to officers on scene. (Rudebeck Dep. at 95:20-25; 96:1-25).

RESPONSE: Undisputed.

52.     At one point, Officer Rudebeck observed Pesavento assume what appeared to be a shooting stance—standing upright, one foot back, and lowering the handgun from his head to his side—before raising it again while yelling, "Kill me," "Let's get this over with," and "Come on." (Rudebeck Dep. at 66:18-23; 106:19-24).

RESPONSE: Disputed. Daniel never took a shooting stance, including in the moments before Rudebeck opened fire. (Petrie Video 00:26–00:30; Hoerning Video 00:18– 00:22; Shuman Dep., pp. 22:25, 23:1–2, 63:3–6; Jenkins Dep., p. 18:1–6; Gueli Dep., p.64:3–23; Thor Dep., pp. 13:15–18, 33:1–6; Hughes Dep., p. 13:11–15; Petrie Dec. ¶ 16-17)

**REPLY: Plaintiffs' response does not create any genuine dispute of material fact as to these proposed findings. A party cannot manufacture a factual dispute without citing evidence that directly addresses—and rebuts—the substance of the proposed fact.**

**Plaintiffs rely on two short video clips (Petrie Video 00:00–00:30; Hoerning Video 00:00–00:22) that together capture approximately 52 seconds of an encounter that lasted roughly 31 minutes. (Zellner Decl. ¶ 12; Ex. J, Gueli BWC at 19:35:13–20:06:15). The absence of particular conduct within those brief excerpts does not create a factual dispute as to whether that conduct occurred at some point during the encounter. For the same reasons, Plaintiffs' reference to testimony from officers who could not identify Pesavento take a shooting stance in specific videos does not create a dispute of fact. (Shuman Dep., p. 63:3–6; Thor Dep., p. 33:1–6).**

**Officer Jenkins's testimony was limited to stating that he did not recall Pesavento taking a shooting stance. (Jenkins Dep. 18:1–6). Similarly, Officers Gueli and Shuman testified only that they did not observe Pesavento assume a *traditional* or *law-enforcement–type* shooting stance. (Gueli Dep. 64:3–23; Shuman Dep. 22:25–23:2). Officer Hughes likewise**

23

testified that he did not see Pesavento take a shooting stance as Hughes personally defined that term. (Hughes Dep. 13:11–15).

This testimony does not create a genuine dispute of material fact. Officer Rudebeck expressly acknowledged that the posture he observed was not the shooting stance taught in formal law-enforcement weapons training. (Rudebeck Dep. 106:25–107:7). Moreover, Rudebeck's description of Pesavento's positioning differed from the definition of a shooting stance offered by Officer Hughes, who described a stance involving a shoulder-width posture, weight on the balls of the feet, one foot slightly back, and arms extended forward with the handgun. (Hughes Dep. 13:11–15).

Accordingly, the officers' testimony is not contradictory. Rather, it reflects consistent observations viewed through different definitions of what constitutes a "shooting stance," and it does not rebut Rudebeck's account of the threatening posture he perceived.

Nor does Plaintiffs' reliance on Petrie's declaration establish a genuine dispute. Petrie qualifies his observations by stating "while I observed him, I never saw Daniel do anything that I felt threatened the police." (Petrie Decl. ¶¶ 17). Petrie did not observe the encounter from its outset—indeed, he states that when he first looked outside, Pesavento was already outside the garage. (*Id.* ¶ 9). In any event, Petrie's subjective assessment of whether Daniel's conduct appeared threatening does not directly rebut the proposed fact that Pesavento took a shooting stance.

Additionally, when a responding party disputes a proposed finding of fact, the response must be limited to those facts necessary to raise a dispute. The court will disregard any new facts that are not directly responsive to the proposed fact.

53. Officer Rudebeck and Officer Jenkins discussed containment concerns and identified that Pesavento's continued movement toward West Brewster Street risked breaking containment and

24

increasing the danger to the public. (Rudebeck Dep. at 62:9-25; 63:1-3, 13-17; 64:8-18).

RESPONSE: Disputed. This is a mischaracterization of what Rudebeck and Jenkins actually said to each other as recorded on their body worn cameras. At 8:02 p.m. Rudebeck stated, "If he gets off the driveway it's done," and in response Jenkins stated, "I agree." (Rudebeck BWC 20:02:54---20:02:57)

**REPLY: The response does not create any material disputes with respect to these proposed facts. Plaintiffs cannot create an issue of fact without providing a citation to evidence that directly meets the substance of and rebuts the proposed fact. Plaintiffs rely on an audio excerpt (Rudebeck BWC 20:02:54---20:02:57) that captures approximately 3 seconds of an encounter that lasted roughly 31 minutes. (Zellner Decl. ¶ 12; Ex. J, Gueli BWC at 19:35:13–20:06:15). The absence of particular communication within those 3 seconds does not create a factual dispute as to whether they occurred at some point during the encounter.**

54. Pesavento ultimately reached the end of the driveway, still armed. (Rudebeck Dep. at 61:24-25; 62:1-8; Petrie Dec. ¶ 22, Ex. 2).

RESPONSE: Undisputed.

55. As Pesavento walked, the barrel of his handgun intermittently pointed in the direction of Officers Rudebeck, Jenkins, and Shuman numerous times. (Rudebeck Dep. at 61:24-25; 62:1-8; Shuman Dep. at 63:25; 64:1-17; Petrie Dec. ¶ 22, Ex. 2).

RESPONSE: Disputed. Plaintiffs object to this proposed fact as vague to the extent that it does not specify when or how many times Daniel purportedly pointed his gun in the direction of Rudebeck, Shuman and Jenkins which makes it misleading. The video evidence shows Daniel at times moving the gun from his head to the ground and back to his head while he is walking slowly around the driveway, but it does not show Daniel pointing the gun at anyone other than himself. (Petrie Video 00:00–00:30; Hoerning Video 00:00–00:22) Witnesses testified that Daniel never

pointed the gun at the police or in the direction of any residence or person in the neighborhood. (Petrie Dec. ¶ 15; Hoerning Dec. ¶ 8-15) In his statement to DCI, Rudebeck never once mentioned that Daniel pointed the gun in his direction. Rudebeck DCI Statement.

**REPLY:** **The response does not create any material disputes with respect to these proposed facts. Plaintiffs cannot create an issue of fact without providing a citation to evidence that directly meets the substance of and rebuts the proposed fact. Plaintiffs again cite the Declaration of Jean Hoerning, but her observations are expressly limited to what she could see from an upstairs window in her home during intermittent periods when Daniel was within her view. (Hoerning Decl. ¶¶ 13–14). Hoerning states only that Daniel pointed the gun in various directions, including toward himself and the ground—testimony that does not contradict Defendants' proposed facts.**

**Similarly, Robert Petrie's declaration is limited to what he personally observed from his vantage point. (Petrie Decl. ¶ 15). In his deposition, Petrie acknowledged that officers could have been positioned in locations not visible from his home. (Petrie Dep. 17:15–18:1). He further agreed that there were moments when Pesavento moved the firearm from the ground up toward his head, during which the gun would have been pointed in directions other than solely at the ground or his head. (*Id.* at 19:25–20:4).**

**The referenced videos likewise depict Pesavento moving the firearm in multiple directions. (Petrie Video 00:00–00:28). The video speaks for itself, and the Court need not— and should not—accept counsel's characterization that "the video evidence does not show…Daniel pointing the gun at anyone other than himself," a conclusory assertion that is neither supported by the cited footage nor admissible evidence.**

**Notably, the cited videos do not show the locations of Officers Rudebeck, Jenkins, or Shuman. As a result, the absence of an on-screen officer does not establish that the firearm**

26

was never oriented in their direction. **To the contrary, officers who were present and aware of their own positioning identified moments in the Petrie video in which Pesavento pointed the firearm toward their location. (Shuman Dep. 63:25–64:17).**

56. Officer Jenkins repeatedly moved the safety on his rifle from "safe" to "fire" due to his growing concern that Pesavento might imminently shoot either officers or others in the area. (Jenkins Dep. at 30:5-10, 22-25; 31:1).

RESPONSE: Disputed. The cited portion of Jenkins' deposition does not support these assertions. Further, Sniper Herbert and Officer Hughes both testified that they never moved the safety on their rifles from "safe" to "fire" because they did not view Daniel as an imminent threat. (Herbert Dep., pp. 16:10 - 17:14; Hughes Dep., pp. 14:4 – 15:3)

**REPLY: Defendants acknowledge that the proposed finding inaccurately summarized the cited testimony. The referenced deposition testimony does not support the assertion that Officer Jenkins repeatedly moved the safety on his rifle from "safe" to "fire," and Defendants do not rely on that characterization.**

**The cited testimony instead establishes that Officer Jenkins perceived an imminent need to engage as Pesavento moved toward the apron of the driveway and into or toward the roadway, prompting Jenkins to place Pesavento in his sights and begin an aiming process to the point where he attempted to discharge his weapon:**

> **A. There were intermittent times when he wasn't in my sights or there were times when I felt like an engagement was pending…It just wasn't continuous. I didn't continually have him in my sights.**
> **Q. Prior to your attempt to fire that weapon how long did you have him in your sights? Just describe where he was at the time prior to that that you first had him in your sights continuously to the point where you attempted to fire your weapon.**
> **A. Okay. I understand what you're asking. I believe he came down to like the apron of the driveway and into or towards the roadway. That's about when I began an aiming process or had him in my sights to the point where I tried to discharge my weapon.**

**(Jenkins Dep. at 30:5-10, 22-25; 31:1). Accordingly, the proposed fact should be understood—**

**and, if necessary, revised—to reflect Officer Jenkins's testimony regarding his perception of an imminent engagement, not manipulation of the rifle's safety.**

**Regardless, Plaintiffs' response does not create a genuine dispute of material fact as to Jenkins's assessment of the threat, and testimony from other officers regarding their own perceptions does not rebut Jenkins's account, as required under Rule 56.**

57. Pesavento then turned toward the three officers. Fearing for his life, the lives of his fellow officers, and the safety of the public, Officer Rudebeck disengaged the safety on his rifle and fired multiple rounds to stop the perceived threat. (Rudebeck Dep. at 68:1-6; Petrie Dec. ¶ 22, Ex. 2:29-32).

RESPONSE: Disputed. Plaintiffs object to this proposed fact as compound. Based on Rudebeck's statements prior to the shooting—"this is what he wants," "we can't like do this for another 40 minutes," and most importantly, "if he gets off the driveway it's done," Rudebeck opened fire on Daniel not because Rudebeck feared for his life, the lives of his fellow officers, and the safety of the public or because he believed Daniel posed an imminent threat, but rather because Daniel stepped off the driveway and into the road. Further, the phrase "turned toward the three officers" is a mischaracterization of what occurred. Daniel did not turn toward the three officers; rather, when Rudebeck opened fire, Daniel was walking slowly in a semi-circle at the bottom of the driveway and took a few steps into the road with the gun pointed to his head while turning away from the officers and looking down at the ground. (Rudebeck BWC 19:57:57, 19:59:20, 20:02:54; Petrie Video 00:21–00:30; Hoerning Video 00:13–00:22; Petrie Dec., ¶ 15; Plaintiffs' Brief in Opposition to Summary Judgment, Argument Section IV) None of the bullets entered the front of Daniel's body. (Autopsy Report, pp. 1, 3–4; Sperry Opinion, p. 3; Petrie Video 00:30–00:34; Hoerning Video 00:22–00:26) Further, Rudebeck's subjective fear is irrelevant to the objective reasonableness analysis. *See Graham v. Connor*, 490 U.S. 386, 397 (1989).

**REPLY: The response does not create any material disputes with respect to these proposed facts. Plaintiffs cannot create an issue of fact without providing a citation to evidence that directly meets the substance of and rebuts the proposed fact. In contravention of FRCP 56(e), Plaintiffs contention that Rudebeck opened fire on Daniel because he stepped off the driveway is not supported by the cited evidence. Statements outside the affiant's personal knowledge or statements that are the result of speculation or conjecture or merely conclusory do not meet this requirement. *Stagman v. Ryan,* 176 F.3d 986, 995 (7th Cir.1999). Moreover, the video speaks for itself, and the Court need not—and should not—accept counsel's characterization that "when Rudebeck opened fire, Daniel was walking slowly in a semi-circle."**

58. After observing Pesavento acquire targets on himself, Officer Rudebeck, and Officer Jenkins, Officer Shuman feared for his life and the safety of others. He disengaged the safety on his rifle and aimed at Pesavento's head with the intent to fire. When Pesavento moved out of Shuman's line of sight, Shuman promptly re-acquired his aim and fired a shot. (Shuman Dep. at 66:7-9; 58:7-24; 25:17-23).

RESPONSE: Disputed. Shuman's justifications for firing his rifle are directly and unequivocally contradicted by the citizen videos. Daniel did not "acquire targets" on Shuman, Rudebeck and Jenkins—*he had his gun pointed against his own head and was looking at the ground when Rudebeck opened fire.* Indeed, he had the gun pointed at his own head for 9 seconds before Rudebeck opened fire. Shuman fired at Daniel after he was already subdued—Daniel dropped his gun to the ground two seconds before Shuman fired and at the moment Shuman fired, which was approximately two seconds after Rudebeck fired his fourth shot, *Daniel had already collapsed to the ground.* (Sperry Opinion, p. 2; Balash Opinion, p. 4; Petrie Video 00:30–00:34; Hoerning Video 00:22–00:26) Further, the phenomenon of sympathetic gunfire—where officers fire their weapons in response to

the immediately preceding gunfire of others—explains why Shuman fired his weapon. (DeFoe Expert Report, p. 21)

**REPLY:** **The response does not create any material disputes with respect to these proposed facts. Plaintiffs cannot create an issue of fact without providing a citation to evidence that directly meets the substance of and rebuts the proposed fact. Nothing in the cited opinions of Sperry and Balash can dispute any assertion about what Officer Shuman did or felt, as they lack the requisite foundation under FRE 602. Further under FRE 603 an expert may only base an opinion on facts or data in the case that the expert has been made aware of or personally observed.**

**Plaintiffs' contention that the phenomenon of sympathetic gunfire explains why Shuman fired his weapon is also not supported by the cited evidence. Expert testimony that merely asserts a "bottom line" or provides testimony based on subjective belief or speculation is inadmissible. *Rogers*, 348 F. Supp. 3d at 897 (citing *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010)). The "critical inquiry" for admissibility is whether the opinion is rationally connected to the underlying data or "connected to the existing data 'only by the ipse dixit of the expert.' " *Id.* (quoting *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017). During the deposition of Defoe he provided the following testimony regarding his opinion on sympathetic gunfire:**

> **Q. In opinion number 4 and 5 in your report, you indicate that you believe sympathetic gunfire explains why Officer Shuman and Officer Jenkins fired in this case, correct?**
> **A. Yes. I mean, it appears, yes.**
> **Q. Okay. And what is -- what do you mean by sympathetic gunfire?**
> **A. Once again, if I hear -- because once again, by looking at the video, for none of the officers was Daniel a lethal threat which would necessitate the use of lethal force. So if I hear you fire many times that the -- whatever reason, the officer – some officers will fire and other officers won't. This case, it appeared that there was sympathetic gunfire because we know that Rudebeck fired his four rounds, and then obviously Shuman fired his one round and missed when it appeared that Daniel was already on the ground. And then Jenkins I don't know because his gun jammed or he didn't deactivate his safety or -- yeah. So, yeah, it's -- it appears that it was contagious**

**sympathetic gunfire based on -- based on my review of the facts.**

**Q. Is it because they fired after Rudebeck?**

**A. Yes. Hearing Rudebeck fire, once again, it -- they fired after Rudebeck fired, correct.**

**Q. And Officer Shuman in this case actually indicated that he was aiming for Mr. Pesavento's head, and then after Rudebeck fired, he then repositioned his shot, correct?**

**A. That's what he testified to, correct.**

**Q. Okay. And so would that still be consistent with sympathetic gunfire?**

**A. It could be.**

**…**

**A. So I don't -- I can only explain that he fired because maybe he believed -- I don't know. I don't know what he believed, but that he -- that somehow he fired because maybe that – you know, Rudebeck saw something. I don't know. But we know that at no point when he fired -- you know, he stated too that he – when he -- he fired first, and then as he moved out of his rifle optic, he held his shot and then regained his sight and fired the shot so – which once again, it could be sympathetic or contagious or could not be. I don't know.**

**(Zellner Declaration, ¶ 3, Ex. A: Defoe Depo. 165:7-166:16, 23-167:9).**

59.     Officer Jenkins observed the same sequence of movements and believed Pesavento was about to discharge his firearm. Officer Jenkins attempted to fire his weapon, but it did not discharge. (Jenkins Dep. at 30:11-15, 22-25; 31:1).

RESPONSE: Disputed. The cited portion of Jenkins' deposition does not support this assertion. Regardless, Jenkins' justifications for firing his rifle are directly and unequivocally contradicted by the citizen videos. Daniel did not "acquire targets" on Shuman, Rudebeck and Jenkins or make aggressive movements towards them nor did he assume a shooting stance—*he had his gun pointed against his own head and was looking at the ground when Rudebeck opened fire*. Indeed, he had the gun pointed at his own head for 9 seconds before Rudebeck opened fire. (Sperry Opinion, p. 2; Balash Opinion, p. 4;   Petrie Video 00:21–00:30; Hoerning Video 00:13–00:22) Further, the phenomenon of sympathetic gunfire—where officers fire their weapons in response to the immediately preceding gunfire of others—explains why Jenkins attempted to fire his weapon. (DeFoe Expert Report, p. 21- 22)

**REPLY:** *See* **Reply to Proposed Facts ¶¶ 56 and 58, which are incorporated in their**

31

entirety herein by reference.

60. Pesavento was armed at the time Officer Rudebeck fired. (Petrie Dec. ¶ 22, Ex. 2).

RESPONSE: Undisputed that Daniel was armed and pointing his gun against his own head at the time Rudebeck opened fire.

**REPLY: The response does not create any material disputes with respect to these proposed facts. Additionally, when a responding party disputes a proposed finding of fact, the response must be limited to those facts necessary to raise a dispute. The court will disregard any new facts that are not directly responsive to the proposed fact.**

61. Pesavento fell to the ground and dropped the handgun. (Rudebeck Dep. at 68:7-8, 12-14; Gueli Dep. at 113:6-9).

RESPONSE: Disputed. Daniel dropped the handgun at the moment he was struck by the third shot. This occurred one second before Rudebeck shot him the fourth time and before Daniel collapsed to the ground. (Petrie Video 00:31-00:33; Hoerning Video 00:23-00:25)

**REPLY: The response does not create any material disputes with respect to these proposed facts. Additionally, when a responding party disputes a proposed finding of fact, the response must be limited to those facts necessary to raise a dispute. The court will disregard any new facts that are not directly responsive to the proposed fact.**

62. Once officers confirmed that the threat had been neutralized, they approached Pesavento with Appleton Fire Department medics to secure the scene and render aid. (Rudebeck Dep. at 69:8-10, 23-25; 70:1-3; 73:16-22; Shuman Dep. at 70:2-11).

RESPONSE: Undisputed. However, Daniel lay motionless and bleeding to death on the ground for two and a half minutes before the less-lethal team approached him to render aid. (VanderWielen BWC 20:06:16-20:08:48)

**REPLY: The response does not create any material disputes with respect to these**

32

**proposed facts. Additionally, when a responding party disputes a proposed finding of fact, the response must be limited to those facts necessary to raise a dispute. The court will disregard any new facts that are not directly responsive to the proposed fact.**

63.     Pesavento died from gunshot wounds. (Dkt. 18, ¶ 56).

RESPONSE: Undisputed.

64.     After identifying themselves as Appleton Police, officers repeatedly ordered Pesavento to drop the gun, put his hands up, and get down on the ground, but he did not comply and continued to manipulate the gun to his own head and body. (Rudebeck Depo. at 55:23-25; 56:1-13; 62:1-3; Gueli Dep. at 91:9-15; 94:1-3; 102:21-25; 103:1-3; Zellner Declaration, ¶ 12: Ex. J, Gueli BWC: 19:35:13-20:06:15).

RESPONSE: Disputed. Plaintiffs object to this proposed fact as vague and compound as it does not specify which officers issued orders, when these orders were issued, and what is meant by the phrase "continued to manipulate the gun" which makes it misleading. The video evidence shows Daniel at times moving the gun from his head to the ground and back to his head while he is walking slowly around the driveway, but it does not show Daniel pointing the gun at anyone other than himself. (Petrie Video 00:00–00:33; Hoerning Video 00:00–00:22) Witnesses testified that Daniel never pointed the gun at the police or in the direction of any residence or person in the neighborhood. (Petrie Dec. ¶ 15; Hoerning Dec. ¶ 8-15)

**REPLY: The response does not create any material disputes with respect to these proposed facts. Plaintiffs cannot create an issue of fact without providing a citation to evidence that directly meets the substance of and rebuts the proposed fact. Plaintiffs again cite the Declaration of Jean Hoerning, but her observations are expressly limited to what she could see from an upstairs window in her home during intermittent periods when Daniel was within her view. (Hoerning Decl. ¶¶ 13–14). Hoerning states only that Daniel pointed the gun in**

33

various directions, including toward himself and the ground—testimony that does not contradict Defendants' proposed facts.

Similarly, Robert Petrie's declaration is limited to what he personally observed from his vantage point. (Petrie Decl. ¶ 15). In his deposition, Petrie acknowledged that officers could have been positioned in locations not visible from his home. (Petrie Dep. 17:15–18:1). He further agreed that there were moments when Pesavento moved the firearm from the ground up toward his head, during which the gun would have been pointed in directions other than solely at the ground or his head. (*Id.* at 19:25–20:4). Plaintiffs also omit contextual testimony from the cited evidence, regarding Mr. Petrie's limited observations regarding civilians. Mr. Petrie testified as follows:

Q. Were there areas you could not see?
A. I told you the areas that I could see. Yes. The areas behind me I could not see.

(Petrie Dep., 20:16-18).

The referenced videos likewise depict Pesavento moving the firearm in various directions. (Petrie Video 00:00–00:28). The video speaks for itself, and the Court need not—and should not—accept counsel's characterization that "the video evidence does not show…Daniel pointing the gun at anyone other than himself," a conclusory assertion that is neither supported by the cited footage nor admissible evidence.

Notably, the cited videos do not show the locations of officers. As a result, the absence of an on-screen officer does not establish that the firearm was never oriented in their direction. To the contrary, officers who were present and aware of their own positioning identified moments in the Petrie video in which Pesavento pointed the firearm toward their location. (Shuman Dep. 63:25–64:17).

65. Officers heard Pesavento yell "Shoot me" and "kill me." (Rudebeck Depo. at 62:3-8)

RESPONSE: Undisputed.

34

66. The time between the garage opening and shots being fired was approximately 31 minutes. (Zellner Declaration, ¶ 12: Ex. J, Gueli BWC: 19:35:13; 20:06:15).

RESPONSE: Undisputed.

67. The Petrie citizen video of the incident captures a substantially different view and angle of Pesavento than Officers Rudebeck, Jenkins, and Shuman had at the time of the shooting. (Rudebeck Depo. at 121:19-23; 122:1; Shuman Dep. at 62:4-19; Petrie Dep. at 7:15-25; 8:1-2).

RESPONSE: Disputed. Plaintiffs object to this proposed fact as vague and misleading as to the phrase "substantially different view." It is undisputed that Robert Petrie was located inside his house at 1825 W. Brewster Street, which was located on the south side of Brewster Street between Rudebeck, Jenkins and Shuman, and the Pesavento driveway, when he recorded the video, but this does not mean that what is shown on the video is "substantially different" from what Rudebeck, Jenkins and Shuman could see at the time of the shooting. (Hughes Dep., p. 29:22 – 30:18)

**REPLY: Plaintiffs' response does not create any genuine dispute of material fact as to these proposed findings. A party cannot manufacture a factual dispute without citing evidence that directly addresses—and rebuts—the substance of the proposed fact.**

**Plaintiffs attempt to challenge the differing *view and angle* of Pesavento as seen in the citizen video versus the perspective of Officers Rudebeck, Jenkins, and Shuman by citing testimony from Officer Hughes. That testimony, however, does not support Plaintiffs' position. Officer Hughes did not share either vantage point and acknowledged only that both he and the individual who recorded the video were located on the south side of West Brewster Street, southeast of the Pesavento driveway. (Hughes Dep. pp. 29:22 – 30:18). This testimony does not contradict the officers' accounts of what they observed from their own positions and therefore does not create a material factual dispute.**

68. The Petrie video was captured on a cell phone using the device's zoom capability to

35

capture a closer view of Pesavento. (Petrie Dep. at 8:25; 9:1; 16:5-8).

RESPONSE: Undisputed.

69. The Petrie video captured only 1 minute and 9 seconds of the entire incident. (Petrie Dep. at 15:7-9).

RESPONSE: Undisputed that the video referenced by Defendants is 1 minute and 9 seconds in length.

**REPLY:** **The response does not create any material disputes with respect to these proposed facts.**

Dated this 4th day of February, 2026.

CRIVELLO, NICHOLS & HALL, S.C.
Attorneys for Defendants

BY: *s/Kiley B. Zellner*
SAMUEL C. HALL, JR.
State Bar No: 1045476
KILEY B. ZELLNER
State Bar No. 1056806
ZACHARY J. FLOOD
State Bar No. 1099136
BENJAMIN J. NICHOLS
State Bar No. 1138101
710 N. Plankinton Ave., Suite 500
Milwaukee, WI 53203
Phone: (414) 271-7722
Fax: (414) 271-4438
Email: shall@crivellolaw.com
kzellner@crivellolaw.com
zflood@crivellolaw.com
bnichols@crivellolaw.com

36