**ESTATE OF DANIEL PESAVENTO, et al.,**

    **Plaintiffs,**

  **v.**        **Case No. 24-CV-647**

**BRYCE RUDEBECK, et al.,**

    **Defendants.**

## DECISION AND ORDER

### 1. Background

Alexandra Pesavento arrived home from work on August 12, 2022, to find her husband, Daniel Pesavento, in a highly intoxicated state that she described as "beyond drunk." (ECF No. 39, ¶ ¶ 3-5.) She told him that she wanted a divorce. (ECF No. 39, ¶ 6.) Daniel went and got his handgun. (ECF No. 39, ¶ 8.) He then punched Alexandra twice in the face, threw or knocked her to the floor, and pulled her hair (ECF No. 39, ¶¶ 9-10.)

Alexandra texted her mother "Mayday," and then, "He hit me and now he's waving a gun. Police will make it worse." (ECF No. 39, ¶ 13-14.) These texts prompted Alexandra's mother to call 911 and request that police respond to the residence. (ECF No. 39, ¶ 15.) Officers from the Appleton Police Department were dispatched to the residential neighborhood at approximately 7:22 PM, and they were informed that

there was a domestic disturbance involving a male and a female and that the male was intoxicated and waving a gun around. (ECF No. 39, ¶ 18.)

Daniel then went into the garage with the gun and shortly thereafter Alexandra heard a pop. (ECF No. 39, ¶¶ 16-17.) Believing that Daniel may have shot himself, Alexandra called 911. (ECF No. 39, ¶ 17.) Officers, who had not yet arrived at the home, were updated with this new information. (ECF No. 39, ¶ 19.)

When officers arrived they were able to get Alexandra and her two-year-old daughter out of the home. (ECF Nos. 39, ¶¶ 21, 24; 44, ¶ 11.) Officers then positioned themselves behind cover around the house. (ECF Nos. 39, ¶¶ 25, 26; 44, ¶ 13.) The garage door was initially closed but soon opened and officers encountered Daniel, clad only in shorts and sandals, armed with a handgun pointed at his head. (ECF No. 39, ¶ 27, 29, 30.)

A standoff ensued, with an officer pleading with Daniel to drop the gun and Daniel pacing the driveway area, making suicidal statements, asking the officers to shoot him, and pointing the gun repeatedly at his head. (ECF Nos. 39, ¶¶ 35, 37, 39, 41, 44-45, 52, 65; 44, ¶¶ 16-20.)

After about 30 minutes of this, Daniel had made his way to the end of the driveway. (ECF Nos. 39, ¶ 66; 44, ¶ 27.) A team equipped with "less-lethal" use of force options, *e.g.*, a ballistic shield, a shotgun loaded with beanbag rounds, and a launcher loaded with 40mm rubber rounds, began approaching from the side of the house. (ECF No. 44, ¶¶ 23-26, 36-38, 40.) Daniel was pacing in a circle with the gun to

his head when Officer Bryce Rudebeck, a member of Appleton Police Department's SWAT Team, fired his rifle four times from what he estimated to be about 50 to 100 yards away.[1] (ECF Nos. 39, ¶¶ 22-24; 44, ¶ 42.) Two other officers positioned at the same squad car as Rudebeck also chose to fire. (ECF No. 39, ¶ 58.) Anthony Jenkins pulled the trigger on his rifle but his weapon did not fire. (ECF No. 39, ¶ 59.) Anthony Shuman fired one round. (ECF No. 39, ¶ 58.)

Daniel was struck four times and died as a result. (ECF Nos. 39, ¶ 63; 38-12 at 2.)

Daniel's estate and his daughter, H.P., brought this action against Rudebeck and the City of Appleton. Against Rudebeck the estate alleges excessive force under the Fourth and Fourteenth Amendments (ECF No. 18, ¶ 68) and wrongful death under state common law (ECF No. 18, ¶¶ 73-78). H.P. alleges loss of companionship against Rudebeck under the Fourteenth Amendment. (ECF No. 18, ¶¶ 70-71.) Both plaintiffs allege claims against the City of Appleton for respondeat superior (ECF No. 18, ¶¶ 83-84) and indemnification under Wis. Stat. § 895.46 (ECF No. 18, ¶¶ 80-81). The defendants seek summary judgment as to the plaintiffs' claims, and that motion

---

[1] An aerial photo labeled with Rudebeck's position suggests that even 50 yards may be an over-estimate, and the range was perhaps no more 40 yards. (*See* ECF No. 38-5 at 2.)

is ready for resolution.[2] The court has jurisdiction under 28 U.S.C. §§ 1331 and 1367(a).

## 2. Summary Judgment Standard

"A motion for summary judgment is a contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law." *Hotel 71 Mezz Lender Ltd. Liab. Co. v. Nat'l Ret. Fund.*, 778 F.3d 593, 601 (7th Cir. 2015). The court does not "weigh the evidence and determine the truth of the matter" but rather "determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The movant has the burden to show that summary judgment is appropriate. *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021). The court will "read the facts and draw all reasonable inferences in the light most favorable to the non-moving party." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 945 (7th Cir. 2024). Nonetheless, the non-movant must go beyond mere allegations and conclusions and instead support its contentions with proper documentary evidence. *Foster v. PNC Bank*, 52 F.4th 315, 320 (7th Cir. 2022); *Weaver*, 3 F.4th at 934. Speculation is insufficient to create a genuine dispute of material fact. *Id*. If the movant sustains its

---

[2] The defendants submitted a reply in support of their proposed findings of fact. (ECF No. 42.) "Although Civil Local Rule 56(b)(3)(B) authorizes a reply to address any *additional* proposed findings of fact submitted by a party opposing the summary judgment motion, it does not allow the moving party to reply to the opposing party's response to the moving party's proposed findings of fact." *Maxwell v. Outagamie Cty. Jail*, No. 20-CV-386, 2022 U.S. Dist. LEXIS 214261, at *13 (E.D. Wis. Nov. 29, 2022) (quoting *Arms v. Milwaukee Cty.*, No. 18-CV-1835, 2021 U.S. Dist. LEXIS 64654, at *7 (E.D. Wis. Apr. 1, 2021) (emphasis in original); citing *Hydraulics Int'l, Inc. v. Amalga Composites, Inc.*, No. 20-CV-371, 2022 U.S. Dist. LEXIS 166539, at *3 (E.D. Wis. Sep. 15, 2022)). The plaintiffs' motion to strike this reply (ECF No. 45) will be granted.

burden and shows both that there are no disputed material facts and that it is entitled to judgment as a matter of law "[t]he court shall grant summary judgment …." Fed. R. Civ. P. 56(a).

## 3. Analysis

### 3.1. Excessive Force

Police officers are permitted to use force, including deadly force, provided it is objectively reasonable to do so. *See Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018); *see also Tennessee v. Garner*, 471 U.S. 1, 9 (1985). Reasonableness is not assessed in hindsight or in a frame-by-frame analysis of video footage, but rather under the totality of the circumstances and from the perspective of a reasonable police officer at the time the force was employed. *See Smith v. Finkley*, 10 F.4th 725, 736 (7th Cir. 2021). Relevant circumstances include "the level of duress involved; and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances." *Id.* (quoting of *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020)) (internal quotation marks omitted). "The obligation to consider the totality of the circumstances in these cases often makes resort to summary judgment inappropriate." *Siler*, 957 F.3d at 759.

The defendants argue that Daniel was demonstrably violent, having just assaulted his wife and fired at least one shot inside his garage. This history, they argue, combined with his erratic behavior while armed with a firearm and refusal to comply with officers' orders posed an immediate threat to officers and civilians in surrounding homes. They further argue that the reasonableness of Rudebeck's

decision to use deadly force is reinforced by the fact that Shuman and Jenkins made the same decision (although Jenkins's rifle failed to fire).

At summary judgment, however, the court views the evidence in the light most favorable to the non-movant. When, as here, there is video of the relevant events, that video is often the most significant evidence. It may negate purported factual disputes or contradict a party's version of events, in which case the court need not accept factual assertions that are plainly contradicted by the video. *See Kailin v. Vill. of Gurnee*, 77 F.4th 476, 480 (7th Cir. 2023) (discussing *Scott v. Harris*, 550 U.S. 372, (2007); quoting *Gant v. Hartman*, 924 F.3d 445, 449 (7th Cir. 2019).). But video evidence might also highlight the need for a trial, such as instances where there may be reasonable disagreements over what the video depicts or its legal significance. *See Pryor v. Corrigan*, 124 F.4th 475, 509 (7th Cir. 2024).

Thus, the court begins with the video evidence. The court received the videos captured by Rudebeck's and two other officers' body-worn camera as well as videos recorded by two citizens. The body-worn camera videos do not capture the shooting due to the location of the officers and the position of the cameras. Rudebeck's video, for example, largely captures only the hood of the vehicle he was behind at the time of the shooting. The citizen videos, however, depict the shooting and Daniels actions immediately before.

The videos of the shooting depict Daniel, in the seconds surrounding the shooting, at the end of his driveway and initially facing away from Rudebeck with the gun at his side. He hunches over a few times in a manner similar to a person retching

or screaming, although no sound is heard. He shakes his head erratically side to side and slaps himself in the head. He lifts the gun back to his temple and begins pacing in a circle. He is about a step or two into the street and his head is facing roughly in the direction of where Rudebeck and other officers are positioned, yet Daniel's head is down and the gun is pointed at his head and thus away from Rudebeck. A shot is heard, and it appears to miss Daniel. Daniel does not break stride and continues pacing about two more steps in a circle, and back onto the apron of the driveway. By this time he is facing his garage, the gun still to his head. There are two more shots in quick succession and Daniel drops the gun. There is then a fourth shot. Daniel goes to his knee and then to the ground. Finally, there is a fifth shot. Daniel lays on his back, the gun at his feet. All shots are fired in roughly four seconds.

Daniel never verbally threatened the officers, nor does it appear that he ever drew aim on anyone other than himself. The gun was pointed at his own head when he was shot, and his head was down. A reasonable finder of fact viewing this evidence could conclude that, when Rudebeck shot him, Daniel did not pose an actual and imminent threat to anyone other than himself and therefore Rudebeck's use of force was unreasonable.

Rather than corroborating Rudebeck's use of force, a reasonable finder of fact could conclude that Shuman's and Jenkin's decisions to fire their rifles were merely a reaction to Rudebeck firing—a phenomenon researchers have termed as "contagious fire." *See, e.g.*, John DeCarlo, et al., *An Experimental Test of the Contagious Fire Thesis in Policing*, 93 J. Crim. Just. 102215 (July-Aug. 2024);

Michael D. White, *et al.*, *Contagious Fire? An Empirical Assessment of the Problem of Multi-shooter, Multi-shot Deadly Force Incidents in Police Work*, Crime & Delinquency (2008); *see also Estate of DiPiazza v. City of Madison*, No. 16-cv-060-wmc, 2017 U.S. Dist. LEXIS 54955, at *13-14 (W.D. Wis. Apr. 11, 2017) (denying qualified immunity where two officers shot a suicidal person who held a gun to her head).

A reasonable finder of fact could also find that the immediate reactions of other police officers at the scene support the conclusion that Rudebeck's use of force was unreasonable. Notably, the record indicates that other officers initially thought that Daniel had shot himself (and an officer fired in response) or that officers discharged less-lethal rounds. (*See, e.g.*, ECF Nos. 38-19 at 4; 38-20 at 4.) In fact, as captured on the bodycam recordings, this was how the shooting was initially reported over the police radio. A reasonable finder of fact could conclude that if there had been an obvious and imminent threat, police officers observing the situation would have immediately recognized that an officer had shot Daniel and not mistakenly assumed that Daniel shot himself.

The defendants' observation that the video "captures a substantially different view and angle" from Rudebeck's vantage (ECF No. 39, ¶ 67) is technically true in that the videos are zoomed in. The clearest one appears to have been taken from a vantage perhaps as many 90 degrees to Rudebeck's left and the other perhaps 150 degrees. (*See* ECF No. 38-5.) But there is no hint that either video captured anything

materially different from what Rudebeck saw. For example, there are no obvious obstructions in any vantage.[3]

Daniel's statements during the standoff suggest that he was contemplating suicide-by-cop, *i.e.* ending his life by prompting officers to use deadly force against him, likewise, do not necessarily justify the use of deadly force. The court recognizes that suicide-by-cop poses extraordinary dangers for law enforcement. But absent an overt and imminent threat to others, a person's expressed desire to commit suicide in this manner cannot justify deadly force by officers. *Weinmann v. McClone*, 787 F.3d 444, 451 (7th Cir. 2015). The defendants are not entitled to summary judgment on the plaintiffs' use of force claim.

### 3.2. Qualified Immunity

"Qualified immunity shields a government official from suit for damages under § 1983 'when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.'" *Sabo v. Erickson*, 128 F.4th 836, 843 (7th Cir. 2025) (en banc) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *Taylor v. Riojas*, 592 U.S. 7, 8 (2020)). "To overcome a qualified immunity defense, plaintiffs must show '(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Sabo*, 128 F.4th at 843 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "A constitutional or statutory right is 'clearly established'

---

[3] An electrical pole was partially in Rudebeck's line of sight when Daniel was on the driveway closer to the garage, but it does not appear it would have affected his view of Daniel at the time he fired.

when the law is 'sufficiently clear that every reasonable official would understand that what he is doing is unlawful.'" *Sabo*, 128 F.4th at 843-44 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotation marks omitted)).

"It is well-established — and has been since long before the shooting at issue here — that 'a person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force.'" *Estate of Williams v. Ind. State Police Dep't*, 797 F.3d 468, 484 (7th Cir. 2015) (quoting *Weinmann*, 787 F.3d at 448). The Court of Appeals for the Seventh Circuit has repeatedly recognized that a person's passive resistance, *e.g.*, a failure to comply with officers' commands, even while armed with a deadly weapon, does not justify the use of deadly force. *Id.* (citing *Abbott v. Sangamon Cty.*, 705 F.3d 706, 732 (7th Cir. 2013); *Estate of Starks v. Enyart*, 5 F.3d 230, 233 (7th Cir. 1993)).

Again, viewing the evidence in the light most favorable to the plaintiffs, Daniel was passively resisting and posed no danger to anyone other than himself at the moment he was shot. "It is clearly established … that officers cannot resort as an initial matter to lethal force on a person who is merely passively resisting and has not presented any threat of harm to others." *Williams*, 797 F.3d at 485 (rejecting officer's claim of qualified immunity in shooting of a suicidal man armed with a knife); *see also Weinmann*, 787 F.3d at 451 (rejecting officer's claim of qualified immunity related to kicking in a door and shooting a suicidal man who had a shotgun on his lap); *Estate of DiPiazza v. City of Madison*, No. 16-cv-060-wmc, 2017 U.S. Dist. LEXIS

54955, at *31-33 (W.D. Wis. Apr. 11, 2017) (denying qualified immunity to officers who shot a suicidal person as she held a gun to her head).

The defendants' attempt to characterize Daniel's noncompliance as "actively resisting" (*see, e.g.*, ECF No. 29 at 17) belies either a mischaracterization of the events captured on the videos submitted to the court or a misunderstanding of "actively" as it is used in this context. *See Williams*, 797 F.3d at 484 (referring to person's failure to comply with orders as passive resistance); *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 525 (7th Cir. 2012) (discussing, in part, *Smith v. Ball State Univ.*, 295 F.3d 763, 771 (7th Cir. 2002) ("what the officers perceived as willful noncompliance was not the same as 'actively resisting' but instead a passive 'resistance *requiring the minimal use of force.*'" (emphasis in original)); *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) ("no evidence suggesting that the plaintiff 'violently resisted' officers even if plaintiff refused to release arms for handcuffing"); *Estate of Escobedo v. Bender*, 600 F.3d 770, 780-81 (7th Cir. 2010) ("plaintiff threatening suicide was not actively resisting arrest even though he said he was intoxicated, had a gun, and had barricaded himself in his room and refused to come out for three hours"). Daniel ignoring the officers' verbal directives to put the gun down, did not constitute "active resistance."

Moreover, Rudebeck's actions can hardly be characterized as a "split-second decision." (ECF No. 29 at 18.) While nearly every decision to use deadly force can be isolated to a fraction of a second, Daniel was shot doing while doing what he had been doing for roughly half-an-hour—pacing with a gun pointed at himself. Rudebeck's

decision to continue firing even after Daniel had dropped the gun and fallen to the ground could be more easily characterized as a split-second decision. But given the pauses between the shots (ECF No. 44, ¶ 44) even that decision could be regarded as inconsistent with clearly established constitutional rights. *See Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) ("It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended."); *Est. of Hernandez v. City of L.A.*, 139 F.4th 790, 795 (9th Cir. 2025) ("It has been clearly established for more than a decade that when an officer shoots and wounds a suspect, and he falls to the ground, the officer cannot continue to shoot him, absent some indication that he presents a continuing threat, without first reassessing the need for lethal force.").

The defendants' assertion that David "intermittently directed his firearm toward [officers] multiple times" similarly appears to reflect a strained characterization of the video evidence. At most, there were perhaps instances where David's gun was transitorily directed towards an officer incidental to David moving it from his side to his head. And in any event, the firearm was directed at Daniel's head and not at any officer when Rudebeck fired.

A reasonable finder of fact could conclude that David did not pose an imminent danger to anyone else at the time he was shot. Were a reasonable finder of fact to reach that conclusion, then it is well established that a police officer may not use deadly force under such circumstances. Accordingly, Rudebeck's motion for summary judgment on the basis of qualified immunity will be denied.

### 3.3. Loss of Companionship

In Count II of the amended complaint, Daniel's minor daughter, H.P., alleges:

> 70. The actions of defendant Rudebeck as described above caused plaintiff H.P to lose the companionship of her father Daniel Pesavento for the rest of her life and thereby violated her Fourteenth Amendment right to due process.
>
> 71. Due to the misconduct of defendant Rudebeck, plaintiff H.P. suffered the loss of the care, society, companionship, protection, training and guidance of Daniel Pesavento.

(ECF No. 18, ¶¶ 70-71.)

The defendants assert that this count fails because "H.P.'s loss of companionship claim in Count II reflects a species of damages for Plaintiff's § 1983 excessive force claim in this matter." (EC F No. 29 at 13.) They continue:

> Notably, the allegations giving rise to Count II do not identify or plausibly assert a constitutional deprivation allegedly caused by Defendants that is separate and distinct from the alleged constitutional violations forming the basis of Plaintiff's § 1983 excessive force claim. Count II is not an independent cause of action, and no further analysis of Plaintiff's claim for damages under Count II is necessary for purposes of summary judgment. As set forth herein, because Officer Rudebeck is entitled to judgment as a matter of law on the merits of Plaintiff's § 1983 excessive force claim and its causes of action under Wisconsin state law, the dismissal of Plaintiff's loss of companionship claim on summary judgment is also warranted.

(ECF No. 29 at 14.)

This is the extent of the defendants' argument. It is unclear if the defendants are arguing simply that H.P.'s claim depends on the estate proving that Rudebeck used excessive force or if they are arguing that a child does not have a substantive due process claim for the death of a parent as a result of allegedly excessive force.

The latter question remains unsettled in the Seventh Circuit, *see Russ v. Watts*, 414 F.3d 783, 790 (7th Cir. 2005), but other judges in this district have recognized that a minor may have an independent constitutional cause of action associated with the death of a parent. *Estate of Fiebrink v. Armor Corr. Health Servs. (In re Estate of Fiebrink),* No. 18-CV-832-JPS, 2019 U.S. Dist. LEXIS 75040, at \*37-38 (E.D. Wis. May 3, 2019); *Avery v. City of Milwaukee*, No. 11-C-408, 2015 U.S. Dist. LEXIS 65372, at \*4 (E.D. Wis. May 19, 2015).

Courts, however, must be cautious about expanding substantive due process to give family members the right to recover for torts inflicted on their relations. "Affording plaintiffs a constitutional due process right to recover against the state in these circumstances would create the risk of constitutionalizing all torts against individuals who happen to have families." *Russ*, 414 F.3d at 790. There is good reason to limit the child's cause of action to instances where the defendant's conduct was intentionally directed at terminating the parental relationship and not when this was merely incidental. *Chambers v. Sanders*, 63 F.4th 1092, 1099 (6th Cir. 2023) ("no constitutional violation of the right to family association exists without a state action directed at the family relationship"); *cf. Russ*, 414 F.3d at 790 ("Neither *Bell* nor the instant case involved intentional action by the state to interfere with a familial relationship; plaintiffs in this case have not alleged that Watts shot Russ for the specific purpose of terminating Russ's relationship with his family."); *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (holding that such familial substantive due process claims are appropriate only when the use of force "shocks the conscience").

The defendants' argument, however, is undeveloped and therefore forfeited. *See United States v. Hook*, 195 F.3d 299, 310 (7th Cir. 1999); *Barker v. Quick Test, Inc.*, No. 13 C 4369, 2016 U.S. Dist. LEXIS 32755, at *55-56 (N.D. Ill. Mar. 15, 2016) (citing *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010)). Notably, the defendants do not cite any authority in support. Accordingly, the defendants' motion for summary judgment regarding H.P.'s due process claim will be denied.

### 3.4. Wrongful Death

The defendants argue that under Wisconsin law a police officer's use of excessive force cannot give rise to a wrongful death claim on a negligence theory because excessive force is an intentional tort. And in any event, police officers enjoy statutory immunity for negligent acts. (ECF No. 29 at 18-23.) Alternatively, insofar as the plaintiffs' wrongful death claim is based on Rudebeck's intentional acts, the defendants seem to argue that the claim fails because Rudebeck's actions did not exceed a police officer's limited privilege to commit battery, *i.e.*, the force reasonably necessary to effect an arrest. (ECF No. 29 at 23-24.)

The plaintiffs offer only the barest of response to these arguments. It is, in its entirety:

> To be clear, Plaintiffs wrongful death claim against Defendant Rudebeck is not based on negligence; rather, it is based on the intentional tort of battery, the elements of which have been fully satisfied for the same reasons set forth in Section IV above. The remainder of Defendants' argument, which cites cases that are more than 50 and 100 years old, is difficult to understand, but to the extent it is based on the premise that

Rudebeck did not use more force than was reasonably necessary, it must
be rejected for the same reasons explained in Section IV above.

(ECF No. 36 at 30.)

With the understanding that the plaintiffs are not alleging that Rudebeck was negligent, the court limits its analysis to the latter of the defendants' arguments. Those arguments depend on Rudebeck's shooting of David being reasonable as a matter of law. As discussed above, a reasonable finder of fact could conclude that Rudebeck's actions were unreasonable. Therefore, the defendants' motion to dismiss the wrongful death claim will be denied.

### 3.5. Respondeat Superior

The plaintiffs do not oppose dismissal of their respondeat superior claim as redundant to their statutory indemnification claim. Accordingly, the court will dismiss "Count V – State Law Claim Respondeat Superior" of the amended complaint.

### 3.6. Indemnification, Wis. Stat. § 895.46

Wisconsin municipalities are required to indemnify their employees for torts committed by the employee within the scope of their employment. *See* Wis. Stat. § 895.46. The plaintiffs included a claim for indemnification in their amended complaint, thus making the City of Appleton a party in this action. The city argues that this claim must be dismissed because Wis. Stat. § 895.46 does not create a cause of action. (ECF No. 29 at 27.)

The plaintiffs point to *Wilson v. City of Chi.*, 120 F.3d 681 (7th Cir. 1997), where the court, applying a similar Illinois statute, held that a plaintiff could allege a claim for indemnification. Under such a claim, the plaintiff is asking essentially for

a declaration that, if the plaintiff is found liable, the city will pay the judgment. *Id.* at 685. One judge in this district has relied on *Wilson* to conclude that, at least at the preliminary screening stage under 28 U.S.C. § 1915A, indemnification under Wis. Stat. § 895.46 is a plausible claim. *See Washington v. JTS*, No. 24-cv-1426-bhl, 2025 U.S. Dist. LEXIS 152, at \*6 (E.D. Wis. Jan. 2, 2025); *Washington v. Co. Richmond*, No. 24-cv-1381-bhl, 2024 U.S. Dist. LEXIS 219149, at \*4-5 (E.D. Wis. Dec. 4, 2024).

However, judges in this district have also dismissed plaintiffs' indemnification claims, noting that Wisconsin courts have said Wis. Stat. § 895.46 does not provide a private cause of action. *See, e.g., Lux v. City of Whitewater*, No. 23-cv-0786-bhl, 2024 U.S. Dist. LEXIS 211882, at \*17 (E.D. Wis. Nov. 21, 2024); *Perez v. Guetschow*, No. 23-cv-153-pp, 2023 U.S. Dist. LEXIS 177804, at \*3-4 (E.D. Wis. Oct. 3, 2023); *Jackson v. Graves*, No. 14-cv-1206-pp, 2015 U.S. Dist. LEXIS 126841, at \*8 (E.D. Wis. Sep. 22, 2015) (citing *Miller v. Mauston Sch. Dist.*, 222 Wis. 2d 540, 550, 588 N.W.2d 305 (Wis. Ct. App. 1998); *Carlson v. Pepin County*, 167 Wis. 2d 345, 356, 481 N.W.2d 498 (Wis. Ct. App. 1992)).

Much of the confusion over whether Wis. Stat. § 895.46 (and its predecessors) permits a direct cause of action for indemnification by an injured party can probably be attributed to the fact that the same statute applies to both state and municipal employees. The indemnification statute does not abrogate the state's sovereign immunity, and thus an injured party cannot pursue a direct action against the state for indemnification. *Fiala v. Voight*, 93 Wis. 2d 337, 348, 286 N.W.2d 824, 830 (1980); *Carlson*, 167 Wis. 2d at 356, 481 N.W.2d at 499; *Yotvat v. Roth*, 95 Wis. 2d 357, 366-

67, 290 N.W.2d 524, 530 (Ct. App. 1980) (citing *Cords v. Ehly*, 62 Wis. 2d 31, 36-37, 214 N.W.2d 432, 435 (1974)).

Municipalities, however, do not enjoy sovereign immunity and thus may be joined as indemnitors pursuant to Wis. Stat. § 895.46. *Fiala*, 93 Wis. 2d at 348, 286 N.W.2d at 830; *Am. Family Mut. Ins. Co. v. Milwaukee*, 148 Wis. 2d 280, 287-88, 435 N.W.2d 280, 284 (Ct. App. 1988) ("Unlike the state, which could not be joined as an indemnitor absent statutory consent under sec. 270.58, Stats., the City can be joined in an action where the plaintiff seeks indemnity."); *Murphy v. Juneau Cty.*, No. 22-cv-33-jdp, 2023 U.S. Dist. LEXIS 70287, at *18 (W.D. Wis. Apr. 21, 2023) (citing cases) ("As this court has held in recent cases, it is appropriate and efficient to keep the county as a defendant in the case for the purpose of ordering complete relief to Murphy" but barring disclosure of the county's status to the jury); *Bautista v. Vill. of Lomira*, No. 12-CV-126, 2013 U.S. Dist. LEXIS 76828, at *48 (E.D. Wis. May 31, 2013); *Estate of Watts v. Heine*, No. 07-CV-644, 2008 U.S. Dist. LEXIS 65288, at *7 (E.D. Wis. Aug. 26, 2008); *Bell v. Milwaukee*, 536 F. Supp. 462, 476 (E.D. Wis. 1982); *see also Martin v. Milwaukee Cty.*, 904 F.3d 544, 550 (7th Cir. 2018) (noting that plaintiff sued both the county employee and the county for indemnification and discussing whether employee's actions were within the scope of his employment and thus subject to indemnification); *S.O. v. Milwaukee Cty. Sheriff's Dep't*, 766 F. Supp. 3d 814, 825-26 (E.D. Wis. 2025) (granting county's motion for summary judgment on plaintiff's indemnification claim because employee's acts were not within the scope of

his employment). In short, a plaintiff may pursue a direct action under Wis. Stat. § 895.46 when the indemnitor is a municipality but not when it is the state.

Substantively, this seems to be largely much ado about nothing. A municipal employee's right to indemnification is automatic; a plaintiff does not need to allege it in the complaint to trigger the municipality's obligation. *Williams v. Michalsen*, No. 19-cv-56-pp, 2020 U.S. Dist. LEXIS 70329, at *27 (E.D. Wis. Apr. 21, 2020). There is no hint that the City of Appleton will not indemnify Rudebeck for any judgment that may be entered against him in this action. And even if not pled as a direct action, should the City of Appleton refuse to pay a judgment, the plaintiffs would presumably be able to "pursue a claim of indemnification as a third-party beneficiary." *Noeldner v. County*, 629 F. Supp. 3d 874, 889 (W.D. Wis. 2022). Nonetheless, because the indemnitor is the City of Appleton, the plaintiffs may pursue a direct action against it under Wis. Stat. § 895.46. The city's motion for summary judgment on that claim will be denied.

### 4. Conclusion

A reasonable finder of fact could conclude that Daniel posed a danger only to himself, and therefore Rudebeck's use of force was unreasonable. Because it was clearly established that a police officer may not use unreasonable deadly force against a person who is merely refusing to comply with officers' commands, even if that person is armed and suicidal, Rudebeck is not entitled to qualified immunity. Rudebeck has failed to demonstrate that the plaintiffs' wrongful death claim or H.P.'s due process claim fail as a matter of law. The City of Appleton is a proper defendant

because indemnification under Wis. Stat. § 895.46 is a cognizable cause of action against a Wisconsin municipality. However, the plaintiffs having conceded that their respondeat superior claim is redundant to their indemnification claim, the court will grant the defendants' motion as to that claim. The defendants' motion for summary judgment is denied in all other respects.

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (ECF No. 28) is **granted in part and denied in part**. The motion is granted as unopposed with respect to the plaintiffs' respondeat superior claim and denied as to all other claims.

**IT IS FURTHER ORDERED** that the plaintiffs' motion to strike the defendants' reply in support of their proposed findings of fact (ECF No. 45) is **granted**. The document filed as ECF No. 42 is **stricken**.

Dated at Green Bay, Wisconsin this 10th day of March, 2026.

s/ Byron B. Conway
BYRON B. CONWAY
U.S. District Judge